STATE of Utah, Plaintiff and Appellee,

v.

Henry Lee RUDOLPH, Defendant
and Appellant.

No. 960482.

Supreme Court of Utah.

July 31, 1998.

Rehearing Denied Oct. 29, 1998.

Jan Graham, Attorney General, Laura B. Dupaix, Assistant Attorney General, Salt Lake City, for plaintiff.

Karen J. Stam, Joan C. Watt, Kristine M. Rogers, Salt Lake City, for defendant.

HOWE, Chief Justice:

Defendant Henry Lee Rudolph appeals from his convictions for aggravated burglary under Utah Code Ann. § 76–6–203, a first degree felony, and violation of a protective order under § 76–5–108, a class A misdemeanor.

## BACKGROUND

The State charged Rudolph with aggravated burglary, aggravated sexual assault, and violation of a protective order. He appeared pro se with the assistance of standby counsel. Following a jury trial in late 1994, he was convicted of and sentenced on the charges of aggravated burglary and violation of a protective order, but was acquitted on the charge of aggravated sexual assault.

Rudolph appealed his convictions to this court. Because significant portions of the trial transcript were incomplete due to technical problems with the court reporter's machinery, we summarily reversed his convictions and remanded his case to the trial court

for a new trial on the aggravated burglary and violation of a protective order charges. On remand, the trial judge, Judge Timothy R. Hanson, recused himself, and the case was reassigned to Judge Pat B. Brian.

In February 1996, Rudolph's new trial began, and he again appeared pro se. However, during the redirect examination of the State's first witness, the court granted Rudolph's motion for a mistrial. He also moved to recuse Judge Brian from further proceedings in the case. Although Judge Brian apparently granted this motion, he continued to preside over Rudolph's third trial.

At the third jury trial, Rudolph was represented by court-appointed counsel. He was again convicted of aggravated burglary and violation of a protective order and was sentenced to concurrent prison terms as prescribed by statute. Rudolph now appeals from these convictions.

## FACTS

Rudolph's convictions arose from the alleged burglary of the victim's home on August 1, 1994. He first met the victim in January 1988 or 1989, and they eventually married in August 1993. Thereafter, their relationship deteriorated, and on June 6, 1994, she obtained an ex parte protective order against him and filed for divorce. Rudolph was served with the ex parte order the following day. She later obtained a permanent protective order at a hearing of which he had notice but did not attend. He was not served with that order.

On the morning of August 1, 1994, Rudolph parked his car around the corner from the victim's home and entered the home by breaking into a basement window. When she returned home later that day, she was greeted by Rudolph, who was standing in the hallway with a large knife in his pocket. He appeared angry and told her that "[she] should have known that he would have a reaction to what [she] had done."[1] He then

noticed a "hickey" on her neck and demanded to know who she had been with. He became irate when she told him that she had been seeing a co-worker. He punched her several times and pushed her onto the sofa.

He then withdrew the knife from his pocket and began yelling obscenities at her. He threatened her, telling her that "[she] would never leave the house again" and that he was going to "cut [her] up into little pieces." He then forced her to disrobe at knife point and continued to berate her with threats and insults as she sat naked on the sofa. After a twenty-minute tirade, he ordered her into the bathroom. He struck her as she walked towards the bathroom, hitting her in the forehead and right ear.

Once in the bathroom, he told her to take a shower and "wash [her] filthy body." He watched her shower and then put down the knife, undressed himself, and entered the shower. He ordered her to wash his genitals and perform oral sex on him. She obeyed his orders because she was afraid for her life. He then told her to lie down in the bathtub, and he had sexual intercourse with her. Afterwards, he insisted that she go into the bedroom, where he once again forced intercourse.

Rudolph apparently calmed down after intercourse, but the victim remained upset and was crying. She was dizzy, nauseated, and her head hurt. She wanted him to leave and told him to do so several times, but he refused.

The victim then asked him to get some boxes from her car. While he was in the garage getting the boxes, she quickly dialed "911" and left the receiver off the hook. After learning that she had called "911," he went into another tirade, renewing his threats and stating that "[he was] going to show [her] what it feels like to be backed up against the wall, with nowhere to go, like a caged animal." He then began to strangle her with his hands, and she momentarily

---

1. It appears that Rudolph was angry with the victim because she had temporarily moved away from her home without telling him where she was staying.

blacked-out. After he finally released her, he forced her back into the bedroom at knife point. He told her that he was going to commit suicide in her car and ordered her to find him a hose that he could insert into the exhaust pipe.

She was finally able to escape while searching for the hose. As she ran out of the garage, two police officers approached her. She ran to them, yelling, "He is going to kill me. He is going to kill me."

Rudolph fled from the house by jumping out of a second-story window. Even though one of the officers sprayed him in the face and eyes with pepper mace Rudolph managed to get to his car and drive off. However, he was apprehended only a few blocks away from the home.

The police collected evidence at the home. They took photographs of the victim and crime scene, recovered a knife in the bedroom, and found a suicide note written by Rudolph.[2] They also questioned Rudolph, and he admitted that he had broken into the victim's home. In addition, he confessed that he had struck her during the incident, that he had a knife with him, and that he had oral sex with her in the shower. However, he maintained that he had not used the knife to threaten her and that sex had been consensual.

Rudolph contends on appeal that (1) the jury instructions regarding the burglary element of intent to commit a sexual assault were erroneous; (2) the trial court erred by including the "remaining unlawfully" language of the burglary statute in its instructions to the jury; (3) the State's evidence did not support his aggravated burglary conviction; (4) the trial judge failed to respond to a question submitted by the jury during deliberations; (5) the judge erred by presiding over Rudolph's third trial even though he had previously recused himself from the case; (6) the double jeopardy guarantee barred his convictions; and (7) the evidence

did not support his conviction for violation of a protective order. Rudolph has also submitted his own pro se briefs, wherein he argues that the prosecutor engaged in prosecutorial misconduct by knowingly using false evidence and perjured testimony at trial. We address each of these assignments of error below.

## ANALYSIS

### I. JURY INSTRUCTIONS ON INTENT TO COMMIT SEXUAL ASSAULT

The first issue that we must resolve is whether three of the trial court's jury instructions regarding the intent element of burglary were erroneous. Although the trial court did not number these instructions, the parties have done so for purposes of this appeal, and we will follow that numbering in this opinion. Rudolph specifically assigns error to instruction 5, instruction 1, and instruction 3. We consider each of these assignments of error in turn.

Rudolph's first assignment of error is that instruction 5 erroneously stated that to convict Rudolph of aggravated burglary, the jury must find that "[he] entered with the intent to commit a *sexual assault* on any person." (Emphasis added.) He asserts that this instruction was erroneous because sexual assault is not a statutorily defined crime in Utah.

The State, however, correctly points out that Rudolph did not object to this instruction in the court below and that rule 19(c) of the Utah Rules of Criminal Procedure precludes Rudolph from raising this issue for the first time on appeal. That rule provides:

(c) No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury is instructed, *stating distinctly the matter to which he objects and the ground of his objection*. Notwithstanding a par-

---

**2.** During the incident, Rudolph apparently told the victim that he originally planned to commit suicide in her home so that she would find him

there. He even showed her how he intended to stab himself with the knife.

ty's failure to object, error may be assigned to instructions to avoid a manifest injustice.

Utah R.Crim. P. 19(c) (emphasis added). "Under the guidance of this rule, we have been very reluctant to review jury instructions and other matters not preserved for appeal by means of an objection at trial." *State v. Anderson*, 929 P.2d 1107, 1108–09 (Utah 1996). In light of the foregoing, we hold that Rudolph has not preserved his right to appeal instruction 5.

Rudolph argues that we may nevertheless review this instruction for manifest injustice. He relies heavily on our decision in *State v. Haston*, 846 P.2d 1276 (Utah 1993) (per curiam), where we reviewed Haston's attempted second degree murder conviction for manifest injustice because he might have been convicted of a crime not recognized in Utah. *See id.* at 1277. We had previously held in *State v. Vigil*, 842 P.2d 843, 845–46 (Utah 1992), that Utah law does not recognize the crime of attempted depraved indifference homicide. Therefore, because the jury instruction at issue in *Haston* permitted the jury to consider depraved indifference homicide, we reviewed Haston's conviction for manifest injustice. *See Haston*, 846 P.2d at 1277. Rudolph contends that we must also review his claim for manifest injustice because *sexual assault* is not a statutorily defined crime in Utah. However, he was not convicted of sexual assault; he was convicted of aggravated burglary, which definitely is a crime in Utah. *See* Utah Code Ann. § 76–6–203. Thus our decision in *Haston* is inapposite to this case.

■ When reviewing a claim of manifest injustice, we generally use the same standard that is applied to determine whether plain error exists under rule 103(d) of the Utah Rules of Evidence. *See State v. Verde*, 770 P.2d 116, 121–22 (Utah 1989). That standard is two-pronged. "First, the error must be 'obvious.' Second, the error must be of sufficient magnitude that it affects the substantial rights of a party." *Anderson*, 929 P.2d at 1109. We conclude that Rudolph cannot meet the first prong of this standard.

Under the Utah burglary statute, "[a] person is guilty of burglary if he enters or remains unlawfully in a building or any portion of a building with intent to commit a felony or theft or commit an assault on any person." Utah Code Ann. § 76–6–202(1). The State points out that this section includes the crime of assault as one of the possible offenses that the actor must intend to commit to be guilty of burglary. It argues further that *sexual assault* is merely a narrower type of assault and, therefore, meets the underlying intent requirement for burglary. We agree.

We hold that the term "sexual assault" merely qualifies the factual circumstances in which the assault occurred or was intended to occur. The trial court's own instructions defining the term "sexual assault" further support this holding. The trial court instructed the jury that "[a] sexual assault is an assault committed in the course of a forcible sexual act." The court then instructed the jury that

"[a]ssault" is

(a) an attempt with unlawful force or violence, to do bodily injury to another; or

(b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or

(c) an act, committed with unlawful force or violence that causes bodily injury to another.

"Bodily injury" means physical pain, illness, or any impairment of physical condition.

This instruction recites Utah Code Ann. § 76–5–102(1) verbatim, which defines the crime of assault. Because the court properly defined the term "sexual assault" and instructed the jury on the statutory elements of assault, we conclude that instruction 5 did not constitute "obvious error." Thus, we refuse to review Rudolph's first assignment of error for manifest injustice.

■ Rudolph's second assignment of error is that instruction 1 failed to conform to the

information filed in this case charging him with aggravated burglary and did not put him on notice that he was charged with intending to commit simple assault, rather than *sexual assault.* Instruction 1 instructed the jury that " '[b]urglary' is defined as entering or remaining unlawfully in a dwelling ... with the intent to commit a felony, or theft or *assault* on any person." (Emphasis added.)

We first note that this assignment of error is wholly inconsistent with the one Rudolph made above. He argued above that instruction 5 was erroneous because "sexual assault" is not a statutorily defined crime in Utah. Now he argues that instruction 1 was erroneous for exactly the opposite reason: It does not use the term "sexual assault." For the reasons set forth above in the discussion of Rudolph's first assignment of error, we conclude that his second assignment of error is also without merit.

Instruction 1 correctly states the statutory elements of burglary. *See* Utah Code Ann. § 76–6–202(1). Although Rudolph is correct that the information charged him with entering or remaining unlawfully in the victim's home with the intent to commit a "sexual assault," we have already stated that the term "sexual assault" merely qualifies the factual circumstances in which the assault occurred or was intended to occur. In other words, a "sexual assault," as charged in the information and as stated in instruction 5, constitutes an assault under Utah Code Ann. § 76–5–102(1). Therefore, both instruction 1 and instruction 5 were correct. Instruction 1 correctly defined the crime of burglary, and instruction 5 correctly instructed the jury that Rudolph was guilty of aggravated burglary, as charged in the information, if he entered or remained in the victim's home unlawfully with intent to commit a "sexual assault." Accordingly, we find no error in instruction 1.

■ Rudolph's final assignment of error with respect to the jury instructions is that instruction 3, which defined "sexual assault" as "an assault committed in the course of a forcible sexual act," was erroneous because it failed to further define "forcible sexual act." He contends that lack of consent is a necessary element of a "forcible sexual act."

■ We first note that although Rudolph objected to this instruction in the trial court, he did so on a different basis than that which he asserts now on appeal. He objected to this instruction on double jeopardy grounds, contending that he had been acquitted of sexual assault in his first trial. As set forth above, rule 19(c) of the Utah Rules of Criminal Procedure provides that in order to preserve an issue involving a jury instruction, the objecting party must make an objection in the trial court, "*stating distinctly* the matter to which he objects and *the ground of his objection.*" Utah R.Crim. P. 19(c) (emphasis added). This rule therefore requires that (1) an objection be made in the trial court to the particular instruction, and (2) that the objecting party state all the grounds for his or her objection. Accordingly, absent a showing of manifest injustice, not only will we refuse to review jury instructions to which the party did not object in the trial court, but we will also refuse to consider grounds for error which were not raised or asserted in the court below. We therefore hold that Rudolph failed to properly preserve the basis for his objection to instruction 3, and we will review it for manifest injustice only.

Applying the "manifest injustice" standard to this assignment of error, we hold that Rudolph has not met his burden. Like instruction 5, above, Rudolph cannot show that the court's failure to define "forcible sexual act" constitutes "obvious" error. This is so because the ordinary meaning of the term "forcible" implies the lack of consent, and ordinary jurors would commonly understand the term "forcible" to include the lack of consent. Therefore, it was unnecessary for the court to include an instruction further defining this term. *Cf. State v. Day,* 572 P.2d 703, 705 (Utah 1977) ("It is presumed that jurors have ordinary intelligence and understand the meaning of ordinary words like 'depraved' and 'indifference.' ").

On the basis of the foregoing, we affirm the challenged jury instructions. Rudolph failed to properly preserve his objections to instructions 3 and 5 and did not meet the manifest injustice standard required to allow us to review those instructions. As for instruction 1, it correctly defined the crime of burglary and thus was not erroneous.

## II. THE "REMAINING UNLAWFULLY" PROVISION

■ The second question raised by this appeal is whether the court committed reversible error by instructing the jury that " '[b]urglary' is defined as entering or *remaining unlawfully* in a dwelling ... with the intent to commit a felony, or theft or assault on any person." (Emphasis added.) Even though this instruction essentially quotes the language of the burglary statute, section 76-6-202(1),[3] Rudolph argues that it erroneously instructed the jury that he committed burglary if he formed the intent to commit a sexual assault at the time he entered or at any time thereafter while he remained unlawfully in the victim's home. He also asserts that the "remaining unlawfully" provision of the statute applies only where the initial entry was lawful. Since it was undisputed that he broke into the victim's home, he therefore maintains that the court erred by including the "remaining unlawfully" language in its jury instructions.

The State correctly points out, however, that Rudolph raises this issue for the first time on appeal. As set forth above, we generally do not consider whether a jury instruction was erroneous absent an objection at trial. *See* Utah R.Crim. P. 19(c); *Anderson,* 929 P.2d at 1108–09. Nevertheless, we address this issue even though it was not properly preserved for appeal because it is necessary to our resolution of Rudolph's other assignments of error.

This issue is one of first impression. Although we have previously held that the "re-

maining unlawfully" provision of section 76-6-202(1) applies where the initial entry was lawful, *see State v. Bradley,* 752 P.2d 874, 876 (Utah 1985), we have never been asked to determine whether it also applies where the entry was unlawful. However, several of the jurisdictions that have decided this issue have held that the intent to commit the underlying crime may be formed after entry and while unlawfully remaining on the premises regardless of whether the entry was lawful. *See Gratton v. State,* 456 So.2d 865, 872 (Ala.Ct.App.1984) (holding defendant is guilty of burglary provided he formed intent to commit another crime when he entered or while he remained unlawfully); *People v. Angell,* 917 P.2d 312, 314 (Colo.Ct.App.1995) ("unlawfully remaining" provision applies even when entry was unlawful); *Hewatt v. State,* 216 Ga.App. 550, 455 S.E.2d 104, 106 (1995) (same); *State v. Skelton,* 247 Kan. 34, 795 P.2d 349, 359 (1990) (same); *McCarthy v. Commonwealth,* 867 S.W.2d 469, 471 (Ky. 1993) (same); *State v. Reams,* 47 Or.App. 907, 616 P.2d 498, 504 (Or.Ct.App.1980) (child court correctly refused to give lesser included instruction on trespass where undisputed evidence showed that defendant had intent to commit assault when he unlawfully entered or remained in dwelling); *State v. DeNoyer,* 541 N.W.2d 725, 732 (S.D.1995) (requisite intent need not be formed at time of unlawful entry). *Contra Arabie v. State,* 699 P.2d 890, 894 (Alaska Ct.App.1985) (interpreting "remaining unlawfully" provision to apply only when entry is lawful); *People v. Collins,* 53 Ill.App.3d 114, 11 Ill.Dec. 134, 368 N.E.2d 685, 688 (1977) (intent to commit underlying crime must exist at time of unlawful entry); *People v. Gaines,* 74 N.Y.2d 358, 547 N.Y.S.2d 620, 546 N.E.2d 913, 915 (1989) (same). In sum, we agree with those cases holding that the "remaining unlawfully" provision applies regardless of whether the initial entry was lawful.

The language of the burglary statute itself does not support Rudolph's contention that

---

**3.** As stated above, the Utah burglary statute provides: "A person is guilty of burglary if he enters or remains unlawfully in a building ... with

intent to commit a felony or theft or commit an assault on any person." Utah Code Ann. § 76-6-202(1).

the "remaining unlawfully" provision applies only when the initial entry is lawful. In particular, the statute does not distinguish between lawful and unlawful entries. The general rule is that "[w]hen faced with a question of statutory construction, we look first to the plain language of the statute." *Stephens v. Bonneville Travel, Inc.*, 935 P.2d 518, 520 (Utah 1997) (citation omitted). Moreover, "courts are not to infer substantive terms into the text that are not already there. Rather, the interpretation must be based on the language used, and the court has no power to rewrite the statute to conform to an intention not expressed." *Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994) (citations omitted). Thus, because the plain language of the statute does not distinguish between lawful and unlawful entries, we refuse to imply such a distinction.

Rudolph nevertheless argues that our interpretation of the "remaining unlawfully" provision is incorrect because it was included in our burglary statute for the purpose of reaching those cases where the actor initially enters a building lawfully but then remains there after his or her right to do so has expired for purposes of committing a crime. While this may be true, it does not necessarily follow that the "remaining unlawfully" provision is confined to those situations where the initial entry was lawful. We believe that such an interpretation would create an anomalous result. For instance, under Rudolph's interpretation of the statute, one who enters lawfully but then remains unlawfully and forms the intent to commit another felony, theft, or assault is guilty of burglary while one who enters unlawfully and thereafter forms that same intent is guilty only of trespass. We are unable to see the distinction between the two scenarios. In our view, the actor in the second scenario is at least as dangerous and culpable as the actor in the first. Therefore, we are not satisfied that our legislature intended such a result when it enacted our current burglary statute.

Rudolph further argues that applying the "remaining unlawfully" provision to all situations, regardless of the lawfulness of the entry, will lead to a slippery slope, making all crimes committed inside a building a burglary. The flaw in this argument, however, is that even under our interpretation, the actor must commit or form the intent to commit another crime at the time he enters or while he remains *unlawfully* in the building. In other words, if the actor commits a crime while *lawfully* inside a building, there is no burglary. Thus, contrary to Rudolph's argument, not all crimes committed in buildings will constitute burglary under our construction of the "remaining unlawfully" provision of the burglary statute.

In conclusion, we hold that a person is guilty of burglary under section 76–6–202(1) if he forms the intent to commit a felony, theft, or assault at the time he unlawfully enters a building or at any time thereafter while he continues to remain there unlawfully. The trial court therefore correctly included the "remaining unlawfully" language in its instructions to the jury.

### III. EVIDENCE PROVING AGGRAVATED BURGLARY

■ The third issue we must address is whether there was sufficient evidence to support Rudolph's aggravated burglary conviction. He argues that the marshaled evidence does not establish that he had the intent to commit a sexual assault when *he entered the victim's home*.

However, under our construction of the "remaining unlawfully" provision of section 76–6–202(1), he committed burglary if he formed the intent to commit a sexual assault either at the time he entered the victim's home or at any time thereafter while he remained there unlawfully. Thus the evidence that he forced the victim to disrobe at knife point, forced her to have oral sex, and forced her to have intercourse was more than sufficient to prove that he had the requisite intent. On this basis, we conclude that the evidence adduced at Rudolph's third trial was sufficient to support his aggravated burglary conviction.

## IV. QUESTION SUBMITTED TO THE COURT DURING DELIBERATIONS

■ The fourth issue is whether the trial court committed reversible error when it ignored the jury's question, asking "if the 'intent' has to be decided upon prior to entry, or after he has entered the home." Rudolph points out that rule 47(n) of the Utah Rules of Civil Procedure requires the court to respond to a question presented by the jury during deliberations. He asserts that the trial judge failed to comply with this rule.

However, we conclude that the error, if any, in the court's failure to respond to this question was harmless. In view of our construction of the "remaining unlawfully" provision of section 76-6-202(1), the jury was merely required to find that Rudolph formed the intent to commit a sexual assault at the time he *broke* into the victim's home *or* while he *remained* there unlawfully. This being so, the court's failure to respond to the jury's question was of no consequence and did not amount to reversible error.

## V. RECUSAL OF JUDGE BRIAN

■ The fifth issue is whether Judge Brian committed reversible error by presiding over Rudolph's third trial after granting his motion to recuse at the end of the second trial. Rudolph asserts that once a judge has recused himself from a case, he cannot take any further non-ministerial action in that case. However, the record shows that Rudolph expressly waived his right to appeal this issue.

Neither party objected when Judge Brian continued to preside over several pretrial hearings that occurred after the judge had announced that he was recusing himself from the case. It was not until approximately five days before the date on which Rudolph's third trial was set to begin that he filed a pro se motion asking Judge Brian to disqualify himself pursuant to the grant of the earlier motion to recuse. On the day of Rudolph's third trial, Judge Brian stated that he was inclined to refer Rudolph's pro se motion to the presiding judge for consideration. At that time, both Rudolph and his counsel stated that they did not want to delay the trial any further and expressly withdrew the motion. Judge Brian made the record very clear by repeatedly asking Rudolph if he wanted him to continue to preside over the case. Each time, Rudolph stated that he wanted the trial to proceed that day with Judge Brian presiding. Based on Rudolph's express statements to the court, he cannot now complain that Judge Brian committed reversible error by presiding over the third trial.

## VI. DOUBLE JEOPARDY

■ The sixth issue raised by this appeal is whether Rudolph's convictions were barred by the protection against double jeopardy. The United States Constitution, the Utah State Constitution, and Utah Code Ann. § 77-1-6(2)(a) each contain double jeopardy clauses with the same content. *See McNair v. Hayward,* 666 P.2d 321, 323 (Utah 1983). Thus our analysis is basically the same for each provision. In short, the double jeopardy guarantee contained in these provisions protects a defendant from (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *See State v. Trafny,* 799 P.2d 704, 709 (Utah 1990); *State v. Franklin,* 735 P.2d 34, 35 (Utah 1987); *United States v. DiFrancesco,* 449 U.S. 117, 129, 101 S.Ct. 426, 433, 66 L.Ed.2d 328, 340 (1980). With these principles in mind, we now turn to Rudolph's double jeopardy arguments.

### A. A Second Prosecution After Conviction is Reversed

■ Rudolph first contends that the guarantee against double jeopardy barred the State from prosecuting him again after his convictions in the first trial were reversed by this court. However, double jeopardy does not generally bar a second trial when a conviction was successfully vacated on appeal

or by motion for a new trial based on errors in the first. *See United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448, 450 (1964) (explaining that rule which permits defendant to be retried after his conviction is set aside on appeal for error is well established in our jurisprudence); *McNair*, 666 P.2d at 323. Notwithstanding this rule, Rudolph contends that his case falls within the narrow exception which prohibits a second trial where a defendant's convictions were vacated on the basis of insufficient evidence. *See Hudson v. Louisiana*, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30, 33 (1981) (holding that granted new trial on basis of insufficient evidence barred new trial); *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1, 12–13 (1978) (double jeopardy bars new trial where conviction is reversed on appeal because of insufficient evidence); *McNair*, 666 P.2d at 325 (same). He argues that the State failed to adduce sufficient evidence in the first trial to support his convictions. We disagree.

The State correctly points out that we summarily reversed Rudolph's convictions in the first trial because significant portions of the trial transcripts were incomplete due to technical problems with the court reporter's machinery. We did not even review the record to determine if the evidence supported his convictions because the incomplete transcripts precluded such a review. Thus it is untenable for Rudolph to now assert that the partial transcript shows that the evidence submitted at the first trial was not sufficient to support his convictions. In sum, we hold that double jeopardy was not violated when he was re-tried following our reversal of his convictions in the first trial.

### B. Collateral Estoppel

Rudolph's second double jeopardy argument is that the doctrine of collateral estoppel precluded his aggravated burglary conviction. He maintains that because he was acquitted of aggravated sexual assault, the State was precluded from proving that he had the intent to commit sexual assault as a necessary element of the aggravated burglary charge.

■ He correctly points out that collateral estoppel is another aspect of the prohibition against double jeopardy. *See Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469, 476 (1970). In that case, the Court explained that "[collateral estoppel] means simply that when an issue of ultimate fact has once been determined by a valid judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. 1189. The Court also stated that

[w]here a previous judgment of acquittal was based upon a general verdict ..., a court [must] "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* at 444, 90 S.Ct. 1189 (footnote omitted) (quoting Mayers & Yarborough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv. L.Rev. 1, 38–39 (1960)). Furthermore, the defendant bears the burden of demonstrating that the issue was actually decided in his favor in the first proceeding. *See Dowling v. United States*, 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708, 719 (1990). Therefore, we must determine in this case whether the jury necessarily based its verdict acquitting Rudolph of aggravated sexual assault on the grounds that *he did not have the intent to commit sexual assault.*

■ The parties agree that in order to convict Rudolph of aggravated sexual assault, the jury had to find that (1) he had sexual intercourse or engaged in forcible sodomy with the victim; (2) that the act of intercourse was without her consent; and (3) that in the course of the sexual act he either (a) caused bodily injury to the victim, (b) used or threatened her with a dangerous weapon, or (c) compelled or attempted to compel her to submit to rape or forcible sodomy by threat of death or serious bodily injury. *See* Utah Code Ann. § 76–5–405. Rudolph argues that a review of the partial transcript from the

first trial demonstrates that the jury necessarily acquitted him of aggravated sexual assault on the basis that the victim consented to oral sex and intercourse. He then contends that a finding of consent is equivalent to a finding that he lacked intent to commit a sexual assault. Even if we agreed with that premise, which we do not, the jury could have acquitted Rudolph on another basis that is just as reasonable.

During Rudolph's closing arguments at the first trial, his standby counsel argued, and perhaps persuasively so, that the State failed to prove the aggravating circumstances element of aggravated sexual assault (element No. 3 above). First, he asserted that when Rudolph entered the shower, he no longer had the knife with him; it was sitting on the counter. Second, he pointed out that there was no evidence that Rudolph threatened to kill or harm the victim while he was in the shower with her or during intercourse in the bedroom. Finally, he maintained that the evidence did not show that Rudolph caused bodily injury or harm to the victim during the sexual acts.

In light of the foregoing, we hold that Rudolph cannot show that the jury necessarily acquitted him of aggravated sexual assault on the basis that he lacked the requisite intent. The acquittal may have been based on the lack of the third element, set out above, the aggravating circumstances. Collateral estoppel therefore did not preclude his aggravated burglary conviction.

### C. Re-prosecution After Mistrial

■■■ Rudolph's third double jeopardy argument is that the protection against double jeopardy was violated when the State was allowed to re-prosecute him following the mistrial. In *Trafny* we stated, "[I]f a defendant seeks a mistrial, he [generally] waives any defense he might otherwise assert based upon double jeopardy, even though the prosecution or the court provoked the error." 799 P.2d at 709 (footnote omitted). However, we also noted that a narrow exception exists "where bad faith conduct by a judge or

prosecutor is intended to provoke a mistrial so as to afford the prosecution a more favorable opportunity to convict." *Id.* (footnote omitted). In those circumstances, double jeopardy does bar re-trial. Therefore, the only question we must decide is whether the prosecution or the trial judge intentionally provoked a mistrial for purposes of affording the State another opportunity to convict Rudolph.

Rudolph contends that the prosecutor intentionally provoked the mistrial by questioning the victim on redirect examination about statements that she made to an adult probation and parole officer following Rudolph's convictions in the first trial. He asserts that this testimony was both inadmissible and highly prejudicial, causing him to move for a mistrial. However, he fails to mention that he actually opened the door concerning these statements. During cross-examination, he asked the victim whether she remembered "making a remark to Bonnie Stitt of Adult Probation and Parole with respect to [the victim's] husband." He then questioned her about the content of that statement. The record therefore shows that Rudolph himself opened the door into the very questioning that he now claims was prejudicial and warranted the mistrial.

Furthermore, we note that Rudolph made two prior motions for a mistrial before it was actually declared. He had asserted, in the presence of the jury, that the trial court was biased and could not give him a fair trial. In granting Rudolph's motion for mistrial, the trial court stated, "[I]n order for the defendant to have his own satisfaction, regarding a fair trial, ... it is appropriate for the Court to declare a mistrial." The court did not even allude to any misconduct by the prosecutor as a basis for the mistrial.

In light of the foregoing, Rudolph cannot demonstrate that the judge or the prosecutor provoked the mistrial, let alone that they did so intentionally. Therefore, double jeopardy did not bar his third trial.

### VII. EVIDENCE PROVING VIOLATION OF A PRO- TECTIVE ORDER

The seventh issue is whether the State adduced sufficient evidence to support Ru-

dolph's conviction for violating a protective order. He correctly points out that an actor must have been "properly served" with the protective order before he or she can be convicted of violating Utah Code Ann. § 76–5–108. He argues that the State presented no evidence that he was served with the permanent protective order. However, the undisputed evidence did show that he was served with the ex parte protective order. In addition, section 76–5–108 provides:

> Any person who has been restrained from abusing or contacting another or ordered to vacate a dwelling or remain away from the premises of the other's residence ... under a protective order or *ex parte protective order* issued under Title 30, Chapter 6, or Title 78, Chapter 3a, who violates that order after having been properly served with it, is guilty of a class A misdemeanor.

(Emphasis added.) Thus, because this section expressly includes ex parte protective orders, we must determine whether Rudolph was properly charged with violating an *ex parte* order and whether it remained in effect at the time of his alleged crimes.

First, the State points out that the information charged Rudolph with violating a protective order that was issued pursuant to Utah Code Ann. § 30–6–6 (1994).[4] It argues further that orders issued pursuant to this section include both ex parte and permanent protective orders. We find this argument persuasive and hold that Rudolph was properly charged with violating either a permanent or an ex parte protective order issued pursuant to section 30–6–6.

■ Second, the State argues that even though Rudolph was not served with the permanent protective order, he remained bound by the terms of the ex parte protective order. Under Utah Code Ann. § 30–6–5(6) (1994), if the defendant had notice of the hearing and the court issues a permanent

protective order, "the terms of the ex parte order shall remain in effect until a certified copy of the [permanent] protective order is properly served on the defendant."[5] Because Rudolph had notice of the hearing regarding the permanent protective order, he remained bound by the ex parte order until that permanent order was served. Therefore, at the time Rudolph broke into the victim's home, the ex parte protective order restraining him from visiting or abusing the victim remained in effect.

For these reasons, we conclude that the evidence supported Rudolph's conviction for violating a protective order.

## VIII. PROSECUTORIAL MISCONDUCT

■ The final issue we must address is whether the prosecutor engaged in misconduct, thereby violating Rudolph's right to due process. Rudolph argues at length in his pro se briefs that the prosecutor knowingly introduced false evidence and perjured testimony at his trial.

In particular, he points out that while Officers Gary Unander and David Clawson stated in their police reports that they found the knife in the bedroom, Detective Alex Huggard's report stated that the knife was actually found in the kitchen. Based on this discrepancy, Rudolph leaps to the conclusion that Officers Unander and Clawson were engaged in a conspiracy to frame him. He contends that they falsified their reports and planted the knife in the bedroom. Furthermore, he argues that Detective Huggard's trial testimony, explaining that he was mistaken in his report about where the knife was actually found, was simply a prevaricating effort to conceal the conspiracy of his fellow officers.

Despite Rudolph's assertion that he is the victim of a police conspiracy, the evidence simply does not support the same. The State's evidence, including the victim's own testimony, fully corroborated both Undan-

---

4. In 1995, section 30–6–6 was repealed and was replaced by Utah Code Ann. § 30–6–4.2. Because section 30–6–6 was in effect at the time that this case arose and is referred to in the information charging Rudolph with violating a protective order, we will refer to it as section 30–6–6 in this opinion.

5. Section 30–6–5(6) was repealed in 1995 and was replaced by Utah Code Ann. § 30–6–4.3(c). Section 30–6–4.3(c) currently provides: "If at that hearing [the hearing for a permanent protective order] the court issues a protective order, the ex parte order remains in effect until service of process of the protective order is completed."

der's and Clawson's police reports. Furthermore, Detective Huggard's testimony explaining the discrepancy between the various police reports was reasonable and was apparently believed by the jury. Thus we reject Rudolph's pro se arguments concerning prosecutorial misconduct.

### CONCLUSION

Having reviewed each of Rudolph's assignments of error, we conclude that each is without merit. We therefore affirm his convictions for aggravated burglary and violation of a protective order. Judgment affirmed.

DURHAM, Associate C.J., and ZIMMERMAN and RUSSON, JJ., concur in Chief Justice HOWE's opinion.

STEWART, J., concurs in the result.