STATE of Utah, Plaintiff and Appellee,

v.

Steven Michael STILLING, Defendant and Appellant.

No. 870094.

Supreme Court of Utah.

Feb. 15, 1989.

Rehearing Denied March 10, 1989.

138

James C. Bradshaw, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Earl F. Dorius, Salt Lake City, for plaintiff and appellee.

HALL, Chief Justice:

Defendant Steven Michael Stilling appeals his convictions for aggravated robbery in violation of Utah Code Ann. § 76–6–302 (1978) and for being a habitual criminal in violation of Utah Code Ann. § 76–8–1001 (1978). The trial court sentenced defendant to two concurrent sentences of five years to life at the Utah state prison. We affirm the convictions but vacate the sentences and remand to the trial court for resentencing.

In March 1984, a Salt Lake County, Utah food store was robbed. A witness to the robbery identified defendant in a photo lineup as the robber.

In April 1984, defendant was arrested in Oregon on fugitive warrants issued out of Weber County, Utah (based on charges unrelated to the Salt Lake robbery). Weber County lodged a detainer with Oregon prison officials against defendant and later requested temporary custody of him. Oregon prison officials approved Weber County's request, and on August 17, 1984, defendant was transported to the Weber County jail.

Sometime prior to July 23, 1984, Salt Lake County also lodged detainers with Oregon prison officials against defendant. Before Salt Lake County requested temporary custody of defendant, it learned that he was in temporary custody of Weber County. Rather than seeking temporary custody of defendant through Oregon officials, Salt Lake County filed arrest warrants against defendant on September 19, 1984, directly with Weber County.

On January 29, 1985—133 days after the arrest warrants were filed with Weber County and 164 days after defendant's arrival in Utah—defendant received a preliminary hearing on the Salt Lake County charges. On February 8, 1985, he was arraigned in Third District Court, and trial was set for March 4, 1985.

Defendant pleaded guilty to the Weber County charges on February 10, 1985, and was sentenced to the Utah state prison.

He was then moved from the Weber County to the Salt Lake County jail to stand trial on the Salt Lake County charges.

Prior to trial, defendant moved to dismiss the Salt Lake County charges on the grounds that Salt Lake County neither (1) requested temporary custody of him from Oregon prison officials, as is required by the Interstate Agreement on Detainers ("IAD"),[1] nor (2) brought him to trial within 120 days, as is also required by the IAD. The trial court agreed with defendant's first theory and ordered him returned to Oregon "on the ground that the defendant could not be tried in Salt Lake County, since the Salt Lake County officials have never sought nor received authority of the Oregon officials to dispose of the charges."

In May 1985, defendant was paroled from the Oregon state prison and returned to Utah to begin serving his sentence on the Weber County convictions. Trial on the Salt Lake County charges was reset, and defendant renewed his motion to dismiss on the ground that Salt Lake County failed to bring him to trial within the IAD's 120–day requirement.

The trial court found that Salt Lake County officials never sought temporary custody of defendant under IAD article IV(a) and concluded that since Salt Lake County never sought custody, the IAD statutory time period was never triggered. Defendant's motion was denied.

Defendant filed an interlocutory appeal in this Court, which was denied. A jury found him guilty of aggravated robbery, and the trial judge found him guilty of being a habitual criminal. He was sentenced to two concurrent sentences of five years to life in the Utah state prison.

I

Defendant claims that Salt Lake County's charges should have been dismissed because he was not brought to trial within the 120–day period required by IAD article IV. We must decide whether Salt Lake County's lodging a detainer against defen-

---

1. The IAD is codified at Utah Code Ann. § 77–29–5 (1982). Provisions of the IAD applicable in this case are explained *infra* at the text accompanying notes 9 through 15.

dant while he was incarcerated in a state that is party to the IAD and then serving him with arrest warrants while he was in temporary custody of Weber County either activated the IAD's statutory time limit or violated the IAD's purpose.

 A detainer is a notice to prison authorities that a prisoner in their custody faces charges pending in another state. Lodging a detainer is an informal process; it neither requires the state lodging a detainer ("the receiving state") to pursue custody[2] nor requires the state in which the prisoner is incarcerated ("the sending state") to do any act or effect any transfer of the prisoner.[3] Lodging a detainer itself, however, may limit a prisoner's privileges and activities.[4] When groundless detainers are lodged, a sending state might restrict a prisoner's privileges to the same extent as when valid detainers are filed.[5]

The IAD benefits prisoners by providing them with a uniform procedure to obtain an expeditious and orderly disposition of charges upon which outstanding detainers are based.[6] The IAD benefits party states by establishing a system of cooperative measures that allow the disposition of charges pending in one state against a prisoner incarcerated in another.[7] In order to enjoy IAD benefits, a party state is required to follow IAD procedures. As noted by the United States Supreme Court, "Once the [state] lodges a detainer against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the [state] must comply with its provisions."[8]

After a detainer is lodged, the IAD time limit is triggered by a request from either the prisoner[9] or the receiving state.[10] When a prisoner is informed of a pending detainer, he or she may request final disposition of the underlying charges.[11] If a prisoner so requests, the receiving state must bring the prisoner to trial within 180 days of receipt of the request.[12] In contrast, the IAD time limit is triggered by a receiving state after it files a detainer and requests temporary custody of the prisoner[13] and the prisoner arrives in the receiving state.[14] The governor of the sending state is given 30 days in which to disapprove the receiving state's request.[15] If no negative action is taken by the sending state's governor, a prisoner may be transferred to the receiving state, which has 120 days after the prisoner's arrival to bring him or her to trial.

In the case before us, defendant did not request disposition of the charges underlying the Salt Lake County detainer. Thus,

---

**2.** *Stroble v. Anderson,* 587 F.2d 830, 835 (6th Cir.1978) (quoting *Ridgeway v. United States,* 558 F.2d 357, 360 (6th Cir.1977), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978)), *cert. denied,* 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

**3.** *Housewright v. Lefrak,* 99 Nev. 684, 669 P.2d 711 (1983).

**4.** A prisoner who faces untried charges upon which a detainer is based is sometimes regarded as an escape risk. He or she might face strict conditions of custody that interfere with rehabilitation programs, preclude desirable work assignments, and disrupt trial preparation. *See* IAD art. I; *United States v. Mauro,* 436 U.S. 340, 359–60, 98 S.Ct. 1834, 1847, 56 L.Ed.2d 329 (1978). Prisoners with outstanding detainers also face the psychological burden of serving one sentence without knowing what additional sentences are before them. This burden may curb desire to participate in whatever rehabilitation opportunities are still available. *Mauro,* 436 U.S. at 353, 98 S.Ct. at 1843.

**5.** *See, e.g., Pitts v. North Carolina,* 395 F.2d 182, 187 (4th Cir.1968).

**6.** IAD art. I; *People v. Higinbotham,* 712 P.2d 993, 997 (Colo.1986) (en banc); *Stroble,* 587 F.2d at 837.

**7.** *Brown v. District Court,* 194 Colo. 225, 227, 571 P.2d 1091, 1092–93 (1977) (en banc); *Stroble,* 587 F.2d at 837.

**8.** *Mauro,* 436 U.S. at 361–62, 98 S.Ct. at 1848.

**9.** IAD art. III; *State v. Martin,* 765 P.2d 854 (Utah 1988).

**10.** IAD art. IV.

**11.** IAD art. III(a).

**12.** *Id.*

**13.** IAD art. IV(a).

**14.** IAD art. IV(c).

**15.** IAD art. IV(a).

the 180–day limit does not apply. While Salt Lake County lodged a detainer against defendant and thereby bound itself to comply with IAD requirements, it did not request temporary custody of defendant from Oregon prison officials. Since Salt Lake County never requested temporary custody of defendant from Oregon officials, it never triggered the 120–day IAD time limit.

Defendant argues that the Salt Lake County detainer lodged with Oregon prison officials activated the IAD clock. This is incorrect. That detainer simply bound Salt Lake County to comply with IAD requirements. It did not bind Salt Lake County to request temporary custody of defendant and thereby activate IAD time constraints.[16] While defendant correctly states that IAD article IV(c) "provides that trial shall be commenced within 120 days of [a prisoner's] arrival in the receiving state where temporary custody is obtained pursuant to Article IV," Salt Lake County did not obtain custody of defendant pursuant to IAD article IV.

Defendant relies on *United States v. Mauro*,[17] claiming that Salt Lake County constructively requested temporary custody of defendant when it filed arrest warrants against defendant with Weber County. In *Mauro*, the United States lodged a detainer against a state prisoner and then sought custody of the prisoner by filing a writ of habeas corpus *ad prosequendam* with state prison officials rather than by requesting temporary custody. The Court held that the United States' writ was tantamount to a written request for temporary custody that triggered the IAD clock.[18] We do not find Salt Lake County's arrest warrants to effectuate the same purpose as the United States' writ.

In *Mauro*, the United States filed its writ with state prison officials, while in this case, Salt Lake County filed its arrest warrants with a sister county. Oregon officials never received a request from Salt Lake County—actual or constructive—for temporary custody of defendant. A ruling that filing warrants with a sister county constitutes a request for temporary custody would allow officials within the receiving state to circumvent a sending state's right to deny the request. Officials within a receiving state could obtain physical custody of a prisoner from a sister county by arrest warrants or other means, avoid IAD procedure, ignore any protest of a sending state's governor, and still fulfill IAD requirements, as long as they brought the prisoner to trial within 120 days. We do not believe the *Mauro* Court intended this circumvention of IAD procedure. In any event, it is a result we will not allow. Salt Lake County's failure to bring defendant to trial within 120 days after filing arrest warrants with Weber County is not a violation of IAD requirements since, at least in this case, warrants filed with a sister county do not constitute a request for temporary custody that activates the IAD 120–day clock.

■ Likewise, we find no violation of the IAD purpose. The IAD is designed to *encourage* the speedy disposition of the outstanding charges upon which a detainer is based in order to *limit* the restriction and disruption to a prisoner that a detainer may cause. However, lodging a detainer itself does not violate this purpose even though lodging a detainer may possibly disrupt a prisoner and restrict his or her opportunities. In this case, defendant may or may not have been restricted by the Salt Lake County detainer. That question is really not at issue. The issue is whether Salt Lake County violated the IAD purpose by filing arrest warrants with Weber County. Granted, the arrest warrants appear to be the catalyst behind Weber County's transferring defendant to Salt Lake County rather than returning him to Oregon "at the earliest practical time."[19] However, as we have previously noted, in this case we do not find an arrest warrant filed with a sister county to constitute an IAD article

---

**16.** *See infra* note 2 and accompanying text.

**17.** 436 U.S. 340, 98 S.Ct. 1834.

**18.** *Id.* at 361–62, 98 S.Ct. at 1848.

**19.** IAD art. V.

IV request for temporary custody of a sending state's prisoner. While defendant was incarcerated in Salt Lake County at the conclusion of the Weber County proceedings, he was arraigned and received a preliminary hearing. The record does not indicate that preparation for his defense was hindered, and defendant faced no uncertainty as to whether Salt Lake County was pursuing prosecution of charges underlying the detainer lodged against him. Upon discovery that defendant was improperly in Salt Lake County custody, the trial court ordered defendant returned to Oregon because "Salt Lake County officials ... never sought nor received authority of the Oregon officials to dispose of the charges." In order for Salt Lake County to obtain temporary custody of defendant, it was required to comply with IAD provisions. We find no error in the trial court's decision.

## II

■ Defendant claims that the trial court erred in failing to arraign him and conduct a preliminary hearing after he was returned to Utah. He argues that since he was not properly in the custody of Salt Lake County, his preliminary hearing in January 1985 and his arraignment in February 1985 were tainted and that he is "entitled to at least one legal pre-trial process."

Both the Utah Constitution [20] and Utah statute [21] require that a defendant receive a preliminary hearing. Despite the fact that defendant was not properly in Salt Lake County custody, the hearing and arraignment he received in January and February 1985 met the outlined constitutional and statutory requirements. The question considered at defendant's preliminary hearing was not whether he was in proper custody of Salt Lake County, but whether there existed "probable cause to believe that the crime charged [was] committed and that the defendant committed it." [22] This question was answered in the affirmative. Since defendant's hearing and arraignment met the mandated constitutional and statutory requirements, we see no error in the district court's refusal to remand this case to circuit court to duplicate the first preliminary hearing and arraignment.

## III

■ Defendant claims that his right to a speedy trial was denied in violation of the United States Constitution,[23] the Utah Constitution,[24] and Utah statute.[25] Whether defendant's right was violated is determined by balancing at least four factors: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." [26]

In *Barker v. Wingo*,[27] the United States Supreme Court indicated that the length of delay that can be tolerated is proportional to the complexity of the case.[28] Aggravated burglary cases are not necessarily the most complex, but the question of proper custody alone was sufficiently difficult and important in this instance to justify the delay defendant suffered. While much of the delay was caused by questions over custody, other delays were caused by motions from the defense and two substitutions of defendant's counsel. Defendant alleges that the State neglected his prosecution; however, the time period for which

**20.** Utah Const. art. I, § 13.

**21.** Utah Code Ann. § 77–35–7(c), (d) (1982) (amended 1988) (the 1988 amendment does not affect defendant's argument).

**22.** Utah Code Ann. § 77–35–7(d)(1) (1982).

**23.** U.S. Const. amends. VI, XIV.

**24.** Utah Const. art. I, § 12.

**25.** Utah Code Ann. § 77–1–6(1)(f) (1982).

**26.** *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972) (footnote omitted). Although in raising his constitutional claims, defendant relies on both the federal and state constitutions, he does not specifically argue that the federal and state analyses differ. Therefore, we treat his claim as based only on federal constitutional provisions. *See State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (1988); *State v. Tillman*, 750 P.2d 546, 551–53 (Utah 1987).

**27.** 407 U.S. 514, 92 S.Ct. 2182.

**28.** *Id.* at 530–31, 92 S.Ct. at 2192.

he claims his case was neglected was not when he was in Salt Lake County custody, but when he was in custody of Weber County waiting disposition of the Weber County charges. Salt Lake County was not responsible for delay during this period. Assuming, *arguendo*, that Salt Lake County officials were negligent in defendant's prosecution, neglect is "a more neutral reason" for a delay which, in this case, does not justify relief.[29] Finally, even if defendant asserted his right to a speedy trial, he makes no persuasive allegation that prejudice resulted from the delay. We conclude that defendant's right to a speedy trial was not denied.

## IV

Defendant claims that the trial court erred when it refused to instruct the jury on the weakness of eyewitness identification. He urges us to retroactively apply *State v. Long*,[30] where we held in part that cautionary eyewitness identification instructions must be given "whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense."[31] Defendant recognizes that we specifically held that the new rule would only apply prospectively and thus would not cover his case since he was tried several weeks before *Long* was decided. Nevertheless, he cites dicta in *Long* where we wrote that failure to provide eyewitness identification instructions "could well deny the defendant due process of law under article I, section 7 of the Utah Constitution."[32] Defendant claims that this language is evidence that the eyewitness identification rule is one of constitutional dimension. He then quotes *Griffith v. Kentucky*,[33] where the United States Supreme Court held that "failure to apply a newly

declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication."[34] Defendant argues that if we decided *Long* on the basis of constitutional due process, we must retroactively apply the *Long* rule to his case to afford him equal protection and due process of law.[35]

We reject defendant's argument because the language defendant quotes from *Long* is dicta. We decided *Long* on neither federal nor state constitutional principles, but rather as a result of our supervisory capacity over the lower courts. Since defendant's case was tried before *Long* became law, we evaluate defendant's claim under the pre-*Long* standard which left the giving of a cautionary instruction to the discretion of the trial judge under the " 'totality of the circumstances.' "[36]

In *State v. Jonas*,[37] we reversed the defendant's conviction and held that under the pre-*Long* standard, the trial court abused its discretion in failing to give a requested cautionary instruction where the victim/witness viewed his assailant for only a few seconds in poor light shortly before the victim/witness was knocked unconscious. This case is different. Here the primary witness had several minutes in good light to view the assailant. He provided the police with a description that matched defendant's, built a composite drawing for the police, and identified defendant in a photo line-up. Three other witnesses saw the assailant and provided corroborating descriptions. One of these witnesses indicated that she was 70 percent sure that defendant was the robber. In short, we find this case to be more closely related to those cases where we have found no abuse of discretion in the trial court's

29. *Id.* at 531, 92 S.Ct. at 2192.

30. 721 P.2d 483 (Utah 1986).

31. *Id.* at 492.

32. *Id.*

33. 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)

34. *Id.* at 322, 107 S.Ct. at 713.

35. U.S. Const. amends. V, XIV; Utah Const. art. I, §§ 2, 7.

36. *State v. Branch*, 743 P.2d 1187, 1190 (Utah 1987) (quoting *State v. Reedy*, 681 P.2d 1251, 1254 (Utah 1984), and citing *State v. Jonas*, 725 P.2d 1378, 1380 (Utah 1986)), *cert. denied*, —— U.S. ——, 108 S.Ct. 1597, 99 L.Ed.2d 911 (1988).

37. 725 P.2d 1378.

failure to provide an eyewitness identification instruction,[38] rather than to *Jonas*, where we found abuse.

## V

The trial court sentenced defendant to two concurrent sentences of five years to life for aggravated robbery and for being a habitual criminal. Defendant contends that a separate sentence for being a habitual criminal violates the purpose of the habitual criminal statute, which is to enhance the punishment for the latest crime, not to create a penalty for being a recidivist. He urges the Court to merge the habitual criminal sentence with the aggravated robbery sentence so that the latter will be truly enhanced. The State claims that the habitual criminal sentence of five years to life will effectively disappear if merged with the aggravated robbery sentence of five years to life since the aggregate total of the two sentences equals just one five-year-to-life sentence. The State claims that this result violates the purpose of the statute because defendant's aggravated robbery sentence will not be enhanced. The issue we must decide is whether a separate sentence for being a habitual criminal is a separate penalty or simply an enhancement of the latest substantive crime.

In 1975, the legislature adopted the current habitual criminal statute.[39] That statute provides in part:

Any person who has been twice convicted, sentenced, and committed for felony offenses at least one of which offenses having been at least a felony of the second degree or a crime which, if committed within this state would have been a capital felony, felony of the first degree or felony of second degree, and was committed to any prison may, upon conviction of at least a felony of the second

degree committed in this state, other than murder in the first or second degree, be determined as a habitual criminal and be imprisoned in the state prison for from five years to life.[40]

Prior to 1975, Utah's habitual criminal statute required that recidivists "be punished by imprisonment in the state prison for not less than fifteen years." [41]

Under the old law, courts merged the fifteen-year indeterminate habitual criminal sentence with the sentence for the substantive offense to create one enhanced sentence. For example, in *State v. Nielson*,[42] the defendant was convicted of arson, for which he received a sentence of one to ten years, and of being a habitual criminal, for which he received a concurrent sentence of not less than fifteen years. This Court noted that the two sentences were improper and indicated that "[s]ince being an habitual criminal is a status and not a crime, no sentence could be imposed therefor." [43] The trial court was instructed to merge the habitual criminal sentence with the arson sentence to create a single indeterminate sentence of not less than fifteen years.

Likewise, in *Clark v. Turner*,[44] the Court inferentially recognized the impropriety of the defendant's sentence of one to twenty years for a burglary conviction and a separate sentence of not less than fifteen years for being a habitual criminal. The trial court was instructed to adjust the sentence. When the defendant petitioned the United States District Court for a writ of habeas corpus, that court noted that the defendant was never resentenced per this Court's instruction and wrote:

It is well established in Utah and elsewhere that the habitual criminal statute does not establish a separate crime. Rather, it imposes an increased penalty upon one found to have become an habitual criminal. This principle was expressed by the Utah Supreme Court in

---

**38.** *See Branch,* 743 P.2d 1187; *State v. Quevedo,* 735 P.2d 51 (Utah 1987); cases cited in *Jonas,* 725 P.2d at 1380–81.

**39.** Utah Code Ann. §§ 76–8–1001, –1002 (1978).

**40.** Utah Code Ann. § 76–8–1001 (1978).

**41.** Utah Code Ann. § 76–1–18 (1953).

**42.** 25 Utah 2d 11, 474 P.2d 725 (1970).

**43.** *Id.* at 13, 474 P.2d at 726 (footnote omitted).

**44.** 19 Utah 2d 210, 429 P.2d 262 (1967).

Zeimer v. Turner, 14 Utah 2d 232, 381 P.2d 721, 723 (1963) as follows:

"Being an habitual criminal is a status, and to be charged with being an habitual criminal is not to be charged with a crime. The habitual criminal statute will apply only upon a conviction of the criminal offense last charged. Its invocation does not inflict additional or further punishment for the prior convictions or impose a new punishment therefor. It only serves to make more severe the punishment for the last or subsequent offense which might be imposed because of the previous convictions." [45]

The district court held that the defendant could not receive separate sentences for the underlying substantive crime *and* for being a habitual criminal. The only sentence that the defendant could receive was an enhanced burglary sentence which necessarily required a merging of the burglary sentence with one for being a habitual criminal.[46]

According to the State, however, the old system of merger does not work with the new statute since merging a five-year-to-life first degree felony sentence with a five-year-to-life habitual criminal sentence does not appear, at least, to enhance the first degree felony sentence. Furthermore, the State argues, the difference between two concurrent sentences and the merger of two sentences is inconsequential since the habitual criminal concurrent sentence serves only to enhance the sentence for the substantive crime.

We disagree. This Court has consistently held that "the [habitual criminal] statute 'does not create a new crime; it merely enhances punishment' for the latest crime." [47] Since no crime exists, there can be no sentence. Assigning a separate sentence for recidivism does more than enhance punishment for the latest crime, it penalizes an individual for past convictions. We see no reason to depart from the logic and consistency of cited precedent just because it is difficult to imagine that one sentence is enhanced when it is overlaid with an identical sentence. Defendant should have received a single sentence of five years to life for aggravated robbery and for being a habitual criminal.

After review of defendant's other claims on appeal, we find them to be without merit. We vacate the sentence and remand to the trial court for resentencing consistent with this opinion.

HOWE, Associate C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.

---

**45.** *Clark v. Turner,* 283 F.Supp. 909, 912 (D.Utah 1968).

**46.** *Id.* at 912. In *Clark,* the respondent State of Utah conceded the point it advocates now. The Court noted, "Counsel for respondent with commendable candor, states in part: '[R]espondent ... concedes the misapplication of [the habitual criminal statute] in petitioner's case. Petitioner, by virtue of the use of the enhancement provisions should not be subjected to two separate sentences.'" *Id.* at 911 n. 4. This principle appears to be the rule followed in every jurisdiction that we have found addressing the topic. *E.g., People v. Watkins,* 684 P.2d 234, 238 n. 7 (Colo.1984) (en banc) ("The trial court erred in imposing separate sentences for [the underlying substantive crime] and habitual criminality."); *accord Lopez v. State,* 108 Idaho 394, 395, 700 P.2d 16, 17 (1985); *Geralds v. State,* 494 N.E.2d 1287, 1289 (Ind.1986); *State v. Campaniello,* 474 A.2d 1247, 1247 (R.I.1984) (per curiam); *see also State v. Barton,* 93 Wash.2d 301, 305, 609 P.2d 1353, 1356 (1980) (en banc) ("An habitual criminal supplemental sentencing information becomes part of the original felony, and provides increased punishment for the latest offense."); *Schuler v. State,* 668 P.2d 1333, 1340 (Wyo.1983) ("It is improper to impose two sentences, one for the underlying felony, and one for the habitual charges.").

**47.** *State v. Bailey,* 712 P.2d 281, 286 (Utah 1985) (quoting *State v. Carter,* 578 P.2d 1275, 1277 (Utah 1978)); *see also State v. Wood,* 2 Utah 2d 34, 37, 268 P.2d 998, 1000 (1954) ("to be charged with being an habitual criminal is not to be charged with a crime"), *cert. denied,* 348 U.S. 900, 75 S.Ct. 221, 99 L.Ed. 706 (1954).