2004 UT 103

**STATE of Utah, Plaintiff and Appellee,**

v.

**Dustyn HARRIS, Defendant and Appellant.**

**No. 20020656.**

Supreme Court of Utah.

Dec. 10, 2004.

Mark L. Shurtleff, Att'y Gen., Kris C. Leonard, David C. Cundick, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

J. Franklin Allred, Erda, for defendant.

NEHRING, Justice:

¶ 1 In this interlocutory appeal, we address whether the trial court erred in denying de-

fendant Dustyn Harris's motion to dismiss. Specifically, we examine whether the double jeopardy provision of the Utah Constitution prohibits Mr. Harris's retrial where the first trial judge, after discovering that the courtroom recording equipment had failed to record the morning trial proceedings, declared a mistrial over Mr. Harris's objection. Because we conclude that the first trial judge abused his discretion in concluding that legal necessity required the mistrial, we reverse the trial court and hold that double jeopardy prohibits Mr. Harris's retrial.

## BACKGROUND

¶ 2 The State of Utah charged Dustyn Harris with three counts of distribution of a controlled substance. Mr. Harris pleaded not guilty. The trial court quashed the bindover on the third count and severed the remaining two counts for separate trials. The State thereafter amended its information against Mr. Harris to allege separate charges of distribution and possession of a controlled substance.

¶ 3 In preparation for the trials on these charges, Mr. Harris filed a discovery request seeking all evidence created, received, or maintained by the Tooele City Police Department in connection with his case. He also sought and received an order allowing him to inspect the evidence. Defense counsel twice attempted to inspect the evidence being held by the police, including methamphetamine Mr. Harris had allegedly distributed. At the first inspection meeting, police informed Mr. Harris's counsel that he would be unable to inspect the evidence because the technician was ill. At the second meeting, counsel learned that the alleged drug samples had been sent to the lab and would not be available for inspection until testing was complete.

¶ 4 Mr. Harris contends that his counsel was not formally provided with the test results until the morning of trial on the distribution charge.[1] As a result of the State's alleged failure to disclose evidence, Mr. Harris filed a motion in limine requesting that the State be prevented from mentioning the nature, amount, and sources of proof of the tested substance in its opening statement. Although there is some uncertainty as to whether this motion was granted or denied, the State apparently omitted any such references when addressing the jury.

¶ 5 During the morning session on the first day of trial, the trial court, Judge Cornaby, empaneled the jury and the parties made their opening statements and examined the State's key witness. After excusing the jury for lunch, Judge Cornaby discovered that the recording equipment in the courtroom had failed to record the morning's proceedings.

¶ 6 When Judge Cornaby asked the parties off the record what they wished to do in light of the malfunction, Mr. Harris apparently offered to continue with the trial and waive any right to an appeal. Alternatively, he suggested that the parties simply reexamine the first witness and proceed with the same jury. The State objected to Mr. Harris's proposed alternatives, arguing that without a record, Mr. Harris would have no basis for an appeal and that Mr. Harris's waiver would likely lead to an ineffective assistance of counsel claim, among others, on appeal. For these reasons, the State asserted that continuing the trial would constitute plain error.

¶ 7 After considering the parties' arguments, Judge Cornaby declared a mistrial. Although he "hate[d] to do it," Judge Cornaby explained that he did not know what else could be done.

¶ 8 In response to the declaration of a mistrial, Mr. Harris formally sought to have the charges dismissed with prejudice, argu-

---

1. There is some question as to whether defense counsel had knowledge of the laboratory tests prior to trial. The State alleges that it verbally informed defense counsel in early May that the evidence had tested positive for methamphetamine. Mr. Harris contends, however, that his defense counsel never discussed the nature of any substance with the State at any time.

ing that double jeopardy barred his reprosecution. Judge Cornaby apparently denied this motion.[2] Mr. Harris alternatively sought a ruling that would prevent the State from using any of the evidence it had failed to disclose prior to the first day of trial. Although Judge Cornaby characterized the State's failure to disclose the laboratory test results until the morning of trial as "unconscionable" and noted that if he were having the trial that day he "would probably not admit [the evidence] for that reason," he nevertheless deferred the decision to the judge assigned to Mr. Harris's retrial.

¶ 9 Judge David Young presided over the retrial of Mr. Harris. Mr. Harris renewed his motion to dismiss with prejudice, arguing that his reprosecution should be barred because (1) the first trial was improperly terminated, and (2) the State committed or allowed to be committed what Mr. Harris described as severe and flagrant discovery abuses that warranted dismissal under rule 16(g) of the Utah Rules of Criminal Procedure. He also renewed his motion in limine to prevent the State from using any of the evidence that it had failed to disclose prior to the first trial. Judge Young denied these motions.

¶ 10 Mr. Harris then sought leave to challenge the trial court's rulings through an interlocutory appeal. The court of appeals granted his petition, instructing the parties to brief, in addition to the double jeopardy and discovery violation issues raised by Mr. Harris, "the jurisdictional effect of *State v. Ambrose*, 598 P.2d 354 (Utah 1979), including its relationship to the provisions of Utah Code Ann. § 77–18a–1(1) (1999)." The court of appeals then certified the issues to this court in accordance with rule 43(c)(1) of the Utah Rules of Appellate Procedure. We have jurisdiction to review issues certified to us by the court of appeals pursuant to Utah Code section 78–2–2(3)(b) (2002).

## ANALYSIS

### I: JURISDICTION

¶ 11 Before deciding whether Judge Young erred in refusing to grant Mr. Harris's motion to dismiss, we must first examine whether we have jurisdiction to entertain Mr. Harris's appeal. Specifically, we must address whether, given our decision in *State v. Ambrose*, 598 P.2d 354 (Utah 1979), Mr. Harris can properly bring an interlocutory appeal of the trial court's denial of his motion to dismiss pursuant to Utah Code section 77–18a–1(1)(c), which provides that a defendant may appeal "an interlocutory order when upon petition for review the appellate court decides the appeal would be in the interest of justice," Utah Code Ann. § 77–18a–1(1)(c) (1999).

¶ 12 Like the instant case, *Ambrose* involved a defendant's appeal from a trial court's denial of a motion to dismiss on double jeopardy grounds. 598 P.2d at 356. There, the defendant was tried for attempted homicide. *Id.* When the jurors expressed difficulty in reaching a verdict after deliberating for a little over an hour, the trial court declared a mistrial. *Id.* at 356–57. When the trial court denied the defendant's subsequent motion to dismiss after determining that a retrial would not violate the defendant's right against double jeopardy, the defendant filed a direct appeal to this court. *Id.* at 357.

¶ 13 At that time, Utah's statutory scheme allowed a defendant to appeal only from final judgments.[3] Consequently, the State argued that this court had no jurisdiction to entertain the defendant's appeal because the order denying the defendant's motion was not final. *See id.* In rejecting this assertion, we explained:

> The denial of defendant's motion is a "final" judgment. The denial effectively

---

2. The trial court never made an explicit ruling with respect to this motion; however, it is apparent from the record that the court declined to dismiss the case with prejudice.

3. Utah Code section 77–39–3, the predecessor of section 77–18a–1, provided that a defendant could appeal only from (1) "a final judgment of conviction" or (2) "an order made, after judgment, affecting the substantial rights of the party." Utah Code Ann. § 77–39–3 (1978).

prevents defendant from obtaining his requested relief, which is based on a substantial constitutional right guaranteed him under both the Utah and the United States Constitutions. The order denying defendant's motion is clearly a complete and final rejection of his double jeopardy claim, a claim by which defendant essentially argues not the *merits* of the charge against him, but rather that the State has forfeited the *power* to again subject him to a criminal proceeding.

*Id.* (footnote omitted). Relying on this merits/power distinction, we concluded that the defendant's direct appeal was properly taken. *Id.*

¶ 14 The State argues that, based on our decision in *Ambrose,* Mr. Harris should have appealed directly from Judge Young's denial of his motion to dismiss. Because he filed a petition for permission to appeal an interlocutory order instead, it asserts that we lack jurisdiction to hear his appeal. Mr. Harris counters that *Ambrose* does not foreclose a defendant's ability to file an interlocutory appeal from the denial of a motion to dismiss on double jeopardy grounds, and suggests that a defendant may file either a direct appeal under *Ambrose* or an interlocutory appeal under Utah Code section 77–18a–1(1).

¶ 15 We disagree with Mr. Harris's implication that the denial of a motion to dismiss can properly constitute a final order for purposes of *Ambrose* and an interlocutory order for purposes of section 77–18a–1. An order is either final or interlocutory—it cannot be both. The more relevant question is whether we should continue, under *Ambrose,* to deem a trial court's denial of a motion to dismiss on double jeopardy grounds to be a final judgment. Although Mr. Harris does not ask that we overrule *Ambrose,* given the apparent tension between our holding in *Ambrose* and section 77–18a–1, we feel it prudent to reexamine *Ambrose* in light of Utah's current statutory framework.

¶ 16 In concluding that the denial of a double jeopardy motion to dismiss was a final judgment in *Ambrose,* our key concern was

the protection of a defendant's fundamental right not to be placed twice in jeopardy—a protection that was seriously threatened by the then-governing statute disallowing interlocutory appeals. We reasoned that

to require [a] defendant to pursue his claim after retrial would, as a practical matter, emasculate the guarantee against double jeopardy, subjecting [a] defendant to the very trauma the provision intends to prevent. The double jeopardy clause protects an individual not simply from subjection to more than one punishment, but from being twice *put to trial* for the same offense. The guarantee assures that, with certain exceptions, an individual will not be forced to endure the strain, embarrassment, anxiety and expense of a criminal trial. These important aspects of the guarantee would clearly be negated if the defendant were forced to endure a second trial before an appeal could be taken. Thus, the rights protected by this provision cannot be fully vindicated on appeal following a second trial.

*Id.* (footnotes omitted). In other words, because the existing statutory scheme would have otherwise been in derogation of a defendant's constitutional right against double jeopardy, we promulgated a strained merits/rights definition of a "final judgment" that allowed us to hear the defendant's appeal. *See id.*

¶ 17 In *McNair v. Hayward,* 666 P.2d 321 (Utah 1983), we acknowledged that our decision in *Ambrose* was primarily ends-means driven. There, we explained that *Ambrose* deviated from our traditional definition of final judgment

for the obvious reason that an application of the normal rule of finality, under which the losing party must wait until after the trial to challenge intermediate rulings, would force the defendant to suffer the prejudice the double jeopardy clause seeks to prevent before he would have an appellate forum to hear his claim.

*Id.* at 325 n. 6.

¶ 18 Having reviewed *Ambrose* and the context within which it was decided, we think

it is clear that *Ambrose* deemed the denial of a motion to dismiss a final order not because such a denial was, in a legal or technical sense, final, but rather because a holding to the contrary would have seriously undermined the double jeopardy protections afforded defendants under the United States and Utah Constitutions. Under our current statutory framework, however, this is no longer a significant danger. The interlocutory appeal procedure in section 77–18a–1 provides defendants with a meaningful way to seek review of a denial of a motion to dismiss without being subject to the trauma the double jeopardy provisions of the United States and Utah Constitutions were meant to prevent. Accordingly, we see no reason why we should continue to deviate from our ordinary final judgment jurisprudence simply because double jeopardy rights are implicated.

¶ 19 The State suggests that, notwithstanding a defendant's ability to petition for permission to appeal an interlocutory order under section 77–18a–1, we should decline to overrule *Ambrose* because it better protects a defendant's important double jeopardy rights. Although we acknowledge that, by deeming the trial court's denial of a motion to dismiss an interlocutory order, a defendant will no longer be entitled to appeal as a matter of right, we nevertheless believe that our present statutory scheme adequately safeguards a defendant's fundamental double jeopardy protections. Utah Code section 77–18a–1 allows a defendant to appeal from not only final orders, but from "interlocutory order[s] when upon petition for review the appellate court decides the appeal would be in the interest of justice." Utah Code Ann. § 77–18a–1(1)(c). Given that subsection (c) allows a defendant to effectively raise any double jeopardy concerns before he or she is "forced to endure a second trial," *Ambrose*, 598 P.2d at 357, we see no reason to continue our adherence to *Ambrose's* holding.

¶ 20 In sum, having determined that the considerations driving *Ambrose's* holding with respect to final judgments are no longer present under our current appellate framework, we overrule *Ambrose* to the extent that it deviates from our general final judgment jurisprudence, and reaffirm that in criminal cases, "it is 'the sentence itself which constitutes a final judgment from which [a defendant] has the right to appeal.'" *State v. Bowers*, 2002 UT 100, ¶ 4, 57 P.3d 1065 (quoting *State v. Gerrard*, 584 P.2d 885, 886 (Utah 1978)). Therefore, a defendant may, in accordance with Utah Code section 77–18a–1(1)(c), file a petition for permission to appeal an interlocutory order denying a motion to dismiss on double jeopardy grounds. Because Mr. Harris properly filed such a petition for review of Judge Young's denial of his motion to dismiss, we have jurisdiction to hear his appeal.

## II. DOUBLE JEOPARDY BARS MR. HARRIS'S RETRIAL

¶ 21 A trial court's decision to grant or deny a mistrial will not be disturbed on appeal absent an abuse of discretion. *State v. Calliham*, 2002 UT 86, ¶ 42, 55 P.3d 573. We will reverse Judge Cornaby's decision to declare a mistrial only if we conclude that he exceeded his discretion, since the decision to grant or deny a mistrial "rests within the sound discretion of the trial court." *Id.* Because Judge Young was in no better position than this court to determine the necessity of a mistrial, we review his denial of Mr. Harris's motion to dismiss for correctness.

### A. *"Legal Necessity" Under Utah's Double Jeopardy Provision*

¶ 22 The double jeopardy provisions in both the United States[4] and Utah[5] Constitutions generally prohibit the State from making repeated attempts to convict an indi-

4. The federal double jeopardy clause, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

5. The Utah double jeopardy provision states that no person "shall ... be twice ... put in jeopardy for the same offense." Utah Const. art. I, § 12.

vidual for the same offense after jeopardy has attached, which in jury trials occurs after a jury has been selected and sworn. *Illinois v. Somerville,* 410 U.S. 458, 466, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (citing *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)); *State v. Ambrose,* 598 P.2d 354, 358 (Utah 1979). Judge Cornaby declared a mistrial and discharged the jury after jeopardy had attached. Mr. Harris contends that these constitutional prohibitions against double jeopardy should operate to prevent the State from retrying him on the distribution charge. In making this assertion, however, Mr. Harris makes no attempt to advance a separate argument or analysis under our state constitution. Consequently, the State suggests that we need only conduct a federal analysis of his double jeopardy claim.

¶ 23 We acknowledge that "[a]s a general rule, we will not engage in [a] state constitutional analysis unless an argument for different analyses under the state and federal constitution is briefed." *State v. Lafferty,* 749 P.2d 1239, 1248 n. 5 (Utah 1988); *accord State v. Seale,* 853 P.2d 862, 873 n. 6 (Utah 1993); *State v. Stilling,* 770 P.2d 137, 142 n. 26 (Utah 1989). However, we apply this rule in cases where a party "relie[s] nominally on state constitutional provisions while actually relying on the parallel federal constitutional provisions and analysis based on them." *Lafferty,* 749 P.2d at 1248 n. 5. In this case, Mr. Harris relies almost exclusively on state authority that interprets and applies our state constitutional double jeopardy protection. Given that the double jeopardy

guarantees afforded defendants under the Utah Constitution are different from and provide greater protection than those afforded by the United States Constitution, *cf. State v. Trafny,* 799 P.2d 704, 709–10 & n. 18 (Utah 1990) (observing that the federal double jeopardy protection is "instructive," but nevertheless conducting a separate analysis pursuant to the Utah Constitution); *Ambrose,* 598 P.2d at 358–60 (articulating and applying a distinct double jeopardy standard under the Utah Constitution that was formulated before the federal double jeopardy clause was made applicable to the states), we decline to engage in a separate analysis under the federal constitution, and conduct our examination within the context of the state double jeopardy protection instead.

¶ 24 Utah's double jeopardy provision is similar to the federal double jeopardy clause in that it protects a defendant from "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Rudolph,* 970 P.2d 1221, 1230 (Utah 1998). As a general rule, the declaration of a mistrial and discharge of a jury before a verdict has been entered will operate as an acquittal, thereby barring the State from retrying a defendant for the same offense. *Ambrose,* 598 P.2d at 358. There is an exception to this general rule, however, which allows the retrial of a defendant if either "(1) the defendant consents to the discharge of the jury, or (2) 'legal necessity' requires the discharge in the interest of justice."[6] *Id.*

¶ 25 Utah's "legal necessity" doctrine parallels the federal "manifest necessi-

---

6. The Utah legislature has codified a similar double jeopardy standard in Utah Code section 76–1–403. Utah Code Ann. § 76–1–403 (2003). That section generally bars the subsequent prosecution of a defendant if the former prosecution resulted in a mistrial after the jury was empaneled but before a verdict was reached. *Id.* § 76–1–403(4). The section will permit the retrial of a defendant, however, if

(a) The defendant consents to the termination; or
(b) The defendant waives his right to object to the termination; [or]
(c) The court finds and states for the record that the termination is necessary because:

(i) It is physically impossible to proceed with the trial in conformity with the law; or
(ii) There is a legal defect in the proceeding not attributable to the State that would make any judgment entered upon a verdict reversible as a matter of law; or
(iii) Prejudicial conduct in or out of the courtroom not attributable to the State makes it impossible to proceed with the trial without injustice to the defendant or the State; or
(iv) The jury is unable to agree upon a verdict; or
(v) False statements of a juror on voir dire prevent a fair trial.

ty" doctrine [7] in that it prohibits a trial court from declaring a mistrial except in those exceptional circumstances where there is a compelling justification for doing so. Our "legal necessity" doctrine differs from its federal counterpart, however, in several key respects.

¶ 26 Although this court has consistently "declined to lay down specific rules" for what constitutes "legal necessity," *id.* at 359; *see also State v. Whitman,* 93 Utah 557, 560, 74 P.2d 696, 698 (1937), we have provided trial courts with an articulable guideline for determining whether a particular set of facts is such that "legal necessity" requires the court to discharge the jury in the interest of justice. Specifically, we have stated that a trial court "must refrain from prematurely discharging the jury unless it determines, after careful inquiry, that discharging the jury is *the only reasonable alternative to insure justice under the circumstances.*" *Ambrose,* 598 P.2d at 358 (emphasis added).

 ¶ 27 For a mistrial to avoid operating as an acquittal under this "only reasonable alternative" standard, two elements must be satisfied. First, a trial court must carefully evaluate all of the circumstances and conclude that legal necessity mandates the discharge of the jury. *See id.* at 360 (citing *Whitman,* 74 P.2d at 698). This requires the trial judge to afford the parties adequate opportunity to object to the declaration of a mistrial. *See id.* at 360–61, 74 P.2d 696. It also requires the trial judge to consider possible curative alternatives to terminating the proceeding and to determine that none of the proposed alternatives are reasonable under the circumstances. *See id.* at 360, 74 P.2d 696.

 ¶ 28 Second, the record must adequately disclose both the factual basis for the trial judge's conclusion that a mistrial was necessary and the reasons why the alternatives presented by either party were unreasonable under the circumstances. *See id.* Although we encourage trial judges to satisfy this second prong by expressly articulating their findings on the record, a mistrial granted without express findings and determinations will not necessarily foreclose the retrial of a defendant as long as the factual basis for the mistrial is readily apparent from the record and the appellate court determines that the proposed alternatives were not reasonable in light of the surrounding circumstances.

 ¶ 29 The requirement that a trial court adequately document its findings on the record is not intended to make trial courts unduly apprehensive of declaring a mistrial for fear that the retrial of a defendant will be barred if an appellate court disagrees with the trial court's assessment of the situation. Trial courts must possess both the authority and the confidence to declare a mistrial when necessary, and we do not mean for this latter requirement to undermine that authority. On the contrary, we acknowledge that trial courts are, with few exceptions, in a superior position to determine whether any proposed alternatives to a mistrial are reasonable in a given situation or whether legal necessity mandates the termination of the proceeding. It is precisely because of this advantaged position that we

*Id.*

Based on the plain language of the statute, a trial judge must state "for the record that the termination is necessary" in order for the mistrial to avoid operating as an acquittal. While application of section 76–1–403 could bar the State from retrying Mr. Harris in this case, Mr. Harris cites this section only twice in his appellate briefs, and provides no analysis or explanation as to how these statutory provisions would operate to bar his retrial independent of the double jeopardy protections afforded under our state constitution. Because he has failed to explore this issue, we decline to address whether section 76–1–403 would prohibit a second trial against Mr. Harris on the distribution charge. *See State v. Gamblin,* 2000 UT 44, ¶¶ 7–8, 1 P.3d 1108 (explaining that a court may decline to address an issue if it is inadequately briefed). However, we encourage trial judges to be mindful of these statutory requirements when declaring a mistrial.

7. *See Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *United States v. Perez,* 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824).

have long entrusted our trial judges with substantial discretion in determining whether varying circumstances that arise during trial are sufficient to justify declaring a mistrial. *See, e.g., Calliham,* 2002 UT 86 at ¶ 42, 55 P.3d 573 ("The decision to grant or deny a mistrial ... rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion."). Consequently, where the trial court articulates on the record the factual basis for its decision to declare a mistrial, and explains on the record why any proposed alternatives are unreasonable, we will not disturb that decision unless it is "plainly wrong," *State v. Widdison,* 2001 UT 60, ¶ 54, 28 P.3d 1278, or is "beyond the limits of reasonability," *Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶ 6, 63 P.3d 686 (quotation omitted).

■ ¶ 30 That being said, where a trial court fails to articulate on the record the factual basis for its decision to grant a mistrial, or to note the reasons why any proposed alternatives are unreasonable, the trial court substantially compromises a reviewing court's ability to ascertain whether the trial court engaged in a "scrupulous exercise of judicial discretion" before terminating the prosecution and discharging the jury. *Ambrose,* 598 P.2d at 360 (internal quotations omitted). Stated a different way, without an adequate record explaining why the trial court acted as it did, we are put at a distinct disadvantage in determining whether a trial judge exceeded his or her discretion in determining that a mistrial was, in fact, the only reasonable alternative under the circumstances. Therefore, where a trial judge fails to articulate the factual basis for a mistrial on the record, the mistrial will operate as an

acquittal unless the factual basis for the mistrial is readily apparent from the record. Further, where a trial judge declares a mistrial and fails to disclose on the record the reasons why the parties' proposed alternatives are not reasonable, the mistrial will operate as an acquittal if we find, based on our own independent assessment, that one or more of the proposed alternatives presented to the trial judge was reasonable under the circumstances.

■ ¶ 31 Applying the "legal necessity" two-part test in this case, we conclude that Judge Cornaby properly met the requirements of the first prong, but exceeded his discretion in determining that neither of Mr. Harris's proposed curative alternatives was reasonable, and instead declaring a mistrial and discharging the jury. With respect to the test's first prong, the record discloses that Judge Cornaby carefully evaluated the circumstances in light of the equipment malfunction and determined that legal necessity required that he terminate the proceedings. Indeed, it is evident that Judge Cornaby was reluctant to declare a mistrial, and did so only after affording both parties the opportunity to object to, and comment on, the propriety of declaring a mistrial. Because Mr. Harris offered to either waive his right to a record or to reexamine the State's key witness in front of the same jury, it is also a reasonable assumption that Judge Cornaby considered, and rejected, Mr. Harris's proposed curative alternatives.[8]

¶ 32 As to the second prong of the test, Judge Cornaby failed to articulate the factual basis for the mistrial. In particular, he failed to state the reasons why he believed Mr. Harris's proposed alternatives were unrea-

---

**8.** Because Judge Young entered a finding of fact that "Judge Cornaby did not engage in an on the record discussion with counsel about possible alternatives to declaring a mistrial," and because the State did not marshal the evidence challenging this finding, Mr. Harris suggests that we should conclude that Judge Cornaby did not discuss any alternatives to a mistrial. We disagree. Although Judge Young was correct in finding that Judge Cornaby did not engage in an *on the record* discussion with regard to possible curative alternatives, it is readily apparent that such alter-

natives were, in fact, discussed, even if not on the record. For example, in a hearing before Judge Young, defense counsel represented that during the first trial Mr. Harris had offered to waive any defect in the record or, alternatively, had requested that the parties simply reexamine the State's key witness. Mr. Harris makes the same representation to this court on appeal. Therefore, it would be unreasonable to conclude that Judge Cornaby did not discuss with the parties any possible curative alternatives to a mistrial before discharging the jury.

sonable. Judge Cornaby did not expressly state that he was declaring a mistrial because the courtroom recording equipment malfunctioned and no record was made of the first morning session, although it is readily apparent from the record that this equipment error was the basis for Judge Cornaby's decision. However, on review, the record is not self-evident as to why Mr. Harris's proposed alternatives were unreasonable, and we are not satisfied that the record adequately discloses the basis for the mistrial.

¶ 33 When a trial judge fails to include the reasons why he or she believes the alternatives proposed by either party are unreasonable under the circumstances, we will undertake an independent examination of whether those potential curatives were, in fact, reasonable alternatives to declaring a mistrial. We recognize events that bring about the specter of a mistrial typically occur without warning and within the charged environment of a trial. The determination that legal necessity mandates the declaration of a mistrial is therefore among the most demanding decisions in the trial judge's repertoire. Having made a difficult decision, the trial judge is the primary beneficiary of an articulated basis for that decision, inasmuch as in the absence of an explanation of the grounds for legal necessity, the trial judge cedes to us the authority and responsibility to second-guess his judgment by conducting an independent assessment of the reasonableness of the proposed alternatives to a mistrial. Here, our review leads us to conclude that Mr. Harris's alternatives were reasonable, legal necessity was not present, and the mistrial was improperly granted.

¶ 34 We first take up Mr. Harris's offer to waive any right to the missing portions of the record. We have previously held that a defendant forfeited or waived his right to a record where the defendant's actions contributed to the absence of a record. See State v. Verikokides, 925 P.2d 1255, 1255–56, 1258 (Utah 1996) (holding defendant forfeited his right to a complete record where the trial transcripts and exhibits were lost or destroyed during defendant's seven-year absence as a fugitive); Emig v. Hayward, 703 P.2d 1043, 1048–49 (Utah 1985) (holding defendant essentially forfeited his right to a complete record because the difficulty in reconstructing the record after the reporter's notes went missing was due primarily to defendant's delay in proceeding with his direct appeal before the court of appeals). If a defendant can unintentionally and negligently waive his right to a record, we see no principled reason why he should not also be allowed to knowingly and affirmatively waive the same right.

¶ 35 We recognize that, on occasion, the mere fact that a defendant consents to the waiver of a record does not necessarily mean that continuing on with the trial without a complete record is a reasonable alternative. For example, if the defendant's waiver would unduly prejudice the State, then continuing on would not be appropriate. However, in the instant case, as in Verikokides and Emig, Mr. Harris's waiver should have been permissible because it involved an after-the-fact evaluation where it was evident that the waiver would not prejudice the State. See Verikokides, 925 P.2d at 1258; Emig, 703 P.2d at 1043, 1048–49.

¶ 36 The State refused to consent to the waiver of the record proposed by Mr. Harris. Judge Cornaby did not believe that he had the authority to order the trial to proceed in the absence of the State's stipulation. We do not believe that the State was empowered to render Mr. Harris's proposed alternative unreasonable merely by withholding its consent to a stipulated waiver of the record. Faced with the very real likelihood that its case would founder because of Judge Cornaby's ruling excluding critical evidence concerning the identification of the alleged controlled substance, the State had every reason to exploit the fortuitous recording mishap. In this setting, the State's resistence to any alternative to mistrial offered by Mr. Harris was not surprising.

¶ 37 Although Judge Cornaby did not cite them as grounds for finding legal necessity,

the dissent advances several reasons why it believes that Mr. Harris's first alternative was unreasonable. The dissent claims that the State, and not Mr. Harris, would suffer prejudice from a waiver of the record both because the State would lose the opportunity to base an appeal on errors contained in the unrecorded proceedings and because the morning's proceedings would not be available to provide background and context for appealable issues which might arise later in the trial. Although pressing on with the trial without a record of the first morning would have resulted in an incomplete record, the events of the morning were, at the time the recording malfunction was discovered, well within the short-term memory of all concerned and not difficult to recall for purposes of noting any potential defects or preserving issues for appeal. Tellingly, the State has not identified any error which may have gone unpreserved had the trial progressed without the record of the first morning's session. We find the dissent's fear that the unrecorded proceedings would become necessary to properly preserve and present appealable issues arising later in the trial to be unfounded. Besides being the product of speculation and brimming with improbability, such an eventuality could have been addressed by a renewed motion for mistrial should a later occurring error relate to the unrecorded portion of the trial. The test here is that the proposed alternative be reasonable, not that it be perfect. Mr. Harris's proposal to waive the morning record certainly meets this standard.

¶ 38 Mr. Harris's second suggestion that the parties reexamine the State's first witness on the record or start the proceedings over in front of the same jury was also a reasonable alternative to a mistrial. Had it been possible to repeat the entire morning's proceedings on the record in front of the same jury, doing so would certainly have been a reasonable alternative to repeating the same process later in front of a second jury. We recognize, of course, that jury voir dire could not have been similarly recreated. However, as with Mr. Harris's first alterna-

tive, any issues that may have arisen during voir dire should have been easily retrieved from counsel's memory, notes, and the jury selection forms. It is again noteworthy that the State never suggested that any defect existed in the jury selection process. We are therefore unpersuaded that Mr. Harris's second alternative method of proceeding was unreasonable.

¶ 39 Consequently, based on our review of the record, we conclude that Judge Cornaby exceeded his discretion in determining that, given the alternatives raised by Mr. Harris, there was no reasonable alternative to a mistrial. Because we conclude that legal necessity did not require the discharge of the jury, Judge Young erred in determining that the retrial of Mr. Harris is not barred by the double jeopardy provision of the Utah Constitution.

¶ 40 Having determined that the State may not retry Mr. Harris on the distribution charge, we need not address Mr. Harris's contentions that the State acted in bad faith in obtaining a mistrial or that Judge Young erred in denying Mr. Harris's motion to exclude evidence.

¶ 41 Chief Justice DURHAM and Justice PARRISH concur in Justice NEHRING'S opinion.

DURRANT, Justice, concurring and dissenting:

¶ 42 I agree, consistent with the analysis and result in Part I of the majority opinion, that we have jurisdiction to hear defendant Dustyn Harris's appeal. I also agree with the standard articulated in Part II of the majority opinion for reviewing a district court's determination of whether legal necessity justifies the declaration of a mistrial. Undertaking the required independent assessment of the circumstances precipitating the declaration of mistrial in this case, however, I cannot agree that either of Harris's proposed curative alternatives was a reasonable alternative to a mistrial.

¶ 43 In concluding that Harris's first offer to waive his right to a record and proceed

with trial was a reasonable alternative, the majority reasons that a defendant's offer to waive his or her right to a record should, as a general rule, constitute a reasonable alternative to a mistrial unless the waiver would unduly prejudice the State. The majority further reasons that, in determining whether a defendant's waiver will result in undue prejudice, the State must bear the burden of justifying its refusal to proceed with the trial without a record. I disagree with both of these assertions.

¶ 44 First, neither of the cases upon which the majority relies supports the conclusion that a defendant's offer to waive his or her right to a record during an ongoing criminal trial may, standing alone, constitute a reasonable alternative to a mistrial. In *State v. Verikokides*, 925 P.2d 1255 (Utah 1996), we held that a defendant forfeited his right to a complete record on appeal where portions of the trial transcript, all trial exhibits, and various attorney files had been lost or destroyed in the seven-year period during which the defendant had fled the jurisdiction. *Id.* at 1255–58. Similarly, in *Emig v. Hayward*, 703 P.2d 1043 (Utah 1985), we held that a defendant essentially waived his right to a complete record on appeal where a court reporter's notes were misplaced during the nineteen months in which the defendant delayed filing his opening appellate brief. *Id.* at 1045, 1048–49. Relying on these cases, the majority reasons that Harris's waiver "should have been permissible because it involved an after-the-fact evaluation where it was evident that the waiver would not prejudice the State."

¶ 45 The difficulty with the majority's conclusion is that the underlying rationale for allowing the defendants' unilateral waivers in *Verikokides* and *Emig* does not apply to situations in which a defendant offers to waive his or her right to a record during an ongoing criminal trial. In both *Verikokides* and *Emig*, the defendants were deemed to have unintentionally waived their rights to a record during the appellate process, not during the trial itself. In those cases, no waiver was "exercised" until the defendant's appeal

before this court—well after the trial below had concluded and a court could ascertain that the defendant, as the sole appellant, was the only party who could be negatively impacted by the missing record. As a result, it was possible to make an "after-the-fact evaluation" that the State was not prejudiced by the unilateral waiver. Because Harris's offer to waive his right to a record arose in the context of an underlying criminal trial, I cannot reach the same conclusion here.

¶ 46 Admittedly, the State did not and does not argue that proceeding without a complete record would have prejudiced its ability to a meaningful appeal, had any error involving the missing portion of the record been discovered later in the proceedings. Nevertheless, I believe that the possibility of such prejudice would have made it unreasonable for Judge Cornaby to accept Harris's waiver offer and proceed with the trial over the State's objection. An appellant has the burden of ensuring that the record contains the materials necessary to support issues raised on appeal; therefore, when an appellant fails to provide an adequate record on appeal, we must presume that the missing portions support the action of the district court. *State v. Theison*, 709 P.2d 307, 309 (Utah 1985). Because at the time Harris offered to waive his right to the record it would have been impossible to know which party, if either, might have been an appellant for purposes of a potential appeal, or how the incomplete record would impact the State if either party were to appeal, Judge Cornaby could not have reasonably concluded, as we did in *Verikokides* and *Emig*, that Harris's waiver would not prejudice the State. For waiver to have presented a viable alternative to a mistrial, both parties would have to have knowingly and affirmatively waived their right to the record. Because it is evident that the State did not consent to a waiver of the record in this case—and in fact vigorously opposed it—Harris's unilateral offer, standing alone, was an unreasonable alternative to a mistrial under the circumstances.

¶ 47 Additionally, even if it were possible for a court to determine that, at the time it

was offered, Harris's waiver would not have prejudiced the State, I can find no support for the majority's implication that the State must justify its refusal to proceed in the criminal prosecution of a defendant without a record. I acknowledge that the State's objection to Harris's waiver offer may have been driven, to a greater or lesser extent, by less-than-altruistic motives. However, it is evident from the record that the State articulated at least some legitimate concerns relating to the missing portion of the record. Specifically, the prosecution feared that if Harris were convicted, the decision to press forward without a critical portion of the record would lead to either an ineffective assistance of counsel or a plain error claim on appeal, and would ultimately result in the case being remanded for a new trial. Given the vital role a record plays for both parties on appeal, it is not surprising that the State would be concerned about the missing record, and would decline to continue with the trial without a complete record of the proceedings. Thus, because there was a possibility that an incomplete record could have compromised the State's ability to successfully defend against any challenge to Harris's conviction on appeal, I do not agree that imposing Harris's unilateral waiver offer on the State would have been a reasonable alternative.

¶ 48 I also disagree that Harris's second proposal—that the parties simply reexamine the State's first witness on the record or begin the proceedings over again—was a reasonable alternative to a mistrial under the circumstances. The majority acknowledges that even if the parties had simply repeated their opening statements and re-examined the first witness on the record, it would have been impossible to similarly recreate jury voir dire. Unlike the majority, I find it neither unreasonably speculative nor particularly improbable that this missing record could have resulted in prejudice to the State. Our recent decision in *West v. Holley*, 2004 UT 97, 103 P.3d 708 illustrates that appealable issues relating to jury selection not only can and do occur, but also may not be readily

identifiable as appealable until later in the proceedings. If the trial had proceeded (over the State's objection) without a record and the State had discovered a prejudicial problem during the trial relating to jury selection, such as that one of the jurors was biased, the State would have been unable to effectively challenge that issue on an interlocutory appeal. *See Theison*, 709 P.2d at 309. In my view, the possibility of such an occurrence would have made continuing on with the trial an unreasonable alternative.

¶ 49 In reaching this conclusion, I acknowledge that any deficiency in the record with respect to voir dire may have been cured by other mechanisms. For example, as the majority points out, the State could have renewed a motion for a mistrial if an appealable issue relating to voir dire had arisen later in the proceedings. Alternatively, as Harris argues on appeal, any issue relating to the missing portion of the record could likely have been remedied through reconstruction of the record. *See* Utah R.App. P. 11. The problem with these curative alternatives is that neither was offered to Judge Cornaby at the time he was forced to render a decision, and both are being addressed for the first time on appeal.

¶ 50 The majority correctly observes that the circumstances under which a district court must declare a mistrial often occur unexpectedly and require a trial judge to make prompt determinations as to whether legal necessity mandates the declaration of a mistrial. *See supra* ¶ 33 ("We recognize events that bring about the specter of a mistrial typically occur without warning and within the charged environment of a trial."). The same is not true when such an issue is raised on appeal, where it may be possible for this court to devise, at our leisure, a reasonable curative alternative in the months (and quite possibly years) following a mistrial. I would decline to assume the proverbial role of armchair quarterback by considering alternatives that were not presented to the trial judge within that charged trial environment. Instead, I would limit my evaluation of the reasonableness of any proposed cura-

tive alternatives to those that either were actually presented or should have been plainly obvious at the time the trial judge rendered his or her decision. Because neither the possibility of a renewed motion for a mistrial nor reconstruction of the record was offered to Judge Cornaby as an alternative to a mistrial or plainly obvious, either standing alone or in conjunction with Harris's other proposed alternatives, I would conclude that Judge Cornaby did not abuse his discretion in rejecting Harris's alternatives as unreasonable under the circumstances.

¶ 51 To summarize, based on an independent examination of the alternatives offered during the proceedings below, I believe there was a possibility that the acceptance of either of Harris's proposed alternatives over the State's objection could have resulted in unfair prejudice to the State. On one hand, if Harris had been convicted and had subsequently challenged his conviction based on the inadequacy of the record below, the fact that the trial had continued without a record might have unfairly limited the State's ability to defend against that challenge on appeal. On the other hand, if a prejudicial error relating to the missing record had arisen during the course of the proceedings, the State would have been effectively precluded from successfully appealing that error on an interlocutory appeal. In my view, Judge Cornaby did not abuse his discretion in declaring a mistrial when confronted with the possibility of such prejudice. Consequently, because I do not agree that Judge Cornaby abused his discretion, I would conclude that Judge Young was correct in determining that the protection against double jeopardy does not prohibit the State from retrying Harris on the distribution charge.

¶ 52 Associate Chief Justice WILKINS concurs in Justice DURRANT'S concurring and dissenting opinion.