*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 11**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner,*

*v.*

RICHARD SCOTT MITTON,
*Respondent.*

No. 20240586
Heard September 8, 2025
Filed May 7, 2026*

On Certiorari to the Utah Court of Appeals

First District Court, Box Elder County
The Honorable Spencer D. Walsh
The Honorable Brandon J. Maynard
No. 211100057

Attorneys:

Derek E. Brown, Att'y Gen., Connor Nelson, Asst. Solic. Gen.,
Salt Lake City, for petitioner

Wayne K. Caldwell, Wayman M. Stodart, Logan, for respondent

ASSOCIATE CHIEF JUSTICE POHLMAN authored the opinion of the
Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUDGE MABEY joined.

Due to his retirement, JUSTICE PEARCE did not participate herein;
DISTRICT COURT JUDGE JENNIFER A. MABEY sat.

---

* As of January 31, 2026, "The Supreme Court consists of seven justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme Court Standing Order No. 18, this court sat and rendered judgment in this matter as a division of five justices.

JUSTICE NIELSEN became a member of the Court after oral argument in this matter and accordingly did not participate.

———————

ASSOCIATE CHIEF JUSTICE POHLMAN, opinion of the Court:

## INTRODUCTION

¶1    At the close of the first day of Richard Mitton's trial, the judge overseeing his case discovered and disclosed to the parties that the judge's wife was related to one of the State's witnesses. In the ensuing hours, Mitton moved to disqualify the judge, arguing that the relationship could undermine the public's perception of the court's impartiality.

¶2    As required by rule, the disqualification motion was referred to another judge—in this case, the district's presiding judge—for review. The next morning, and before trial resumed, the presiding judge granted the motion, "vacated the trial," and transferred the case to another judge in the district without affording the parties an opportunity to object. The trial judge then excused the jury and advised counsel and Mitton of the developments. The State later filed an amended information with an enhanced charge and moved for an expedited trial setting with the newly assigned judge.

¶3    Before a subsequent trial could occur, Mitton moved to dismiss the charges against him on the basis that, among other things, Utah's double jeopardy protection barred his retrial. The new judge disagreed. He rejected the motion to dismiss because he concluded that an exception to double jeopardy applied to Mitton's case—that is, there were no reasonable alternatives, so the mistrial and discharge of the jury had been legally necessary. Mitton appealed.

¶4    The court of appeals reversed and decided that the legal necessity exception to double jeopardy did not apply. Relying on our precedent, the court of appeals concluded that the trial court's failure to afford the parties an opportunity to object before declaring a mistrial precluded a finding of legal necessity, regardless of what the circumstances were. And as a result, the court concluded that double jeopardy barred the State from retrying Mitton.

¶5    We granted certiorari to decide whether a failure to afford parties an opportunity to object before declaring a mistrial is dispositive in the legal necessity analysis. We conclude that it is not.

Even where parties are not afforded an opportunity to object, if the record reveals that there were no reasonable alternatives to mistrial under the circumstances, the legal necessity exception to double jeopardy applies.

¶6　Accordingly, we reverse the court of appeals' decision ordering dismissal of the charges against Mitton. Because the court of appeals did not address whether there were reasonable alternatives to declaring a mistrial, and because the issue is not before us on certiorari review, we remand to the court of appeals to address that question and to consider, if necessary, any remaining arguments.

## BACKGROUND[1]

### *The Criminal Charges*

¶7　The State charged Mitton with two counts of aggravated assault (domestic violence), which were both classified as third-degree felonies. The charges arose out of an altercation between Mitton and his brother-in-law, Brad,[2] in which Brad allegedly sustained numerous injuries requiring medical attention. Brad's wife (Wife) was present during the incident, and the State identified her as a potential trial witness.

### *The Trial Court Proceedings*

¶8　The Honorable Brandon J. Maynard, who is assigned to the Brigham City courthouse, presided over the first day of Mitton's jury trial. Judge Maynard impaneled and swore in the jury, and the jury heard opening statements and direct testimony from Brad, who began to describe the circumstances leading to his altercation with Mitton.

---

[1] In providing the relevant background, we emphasize that the allegations against Mitton are not proved and that he is presumed innocent. *See* UTAH CODE § 76-1-501(1) ("A defendant in a criminal proceeding is presumed to be innocent until each element of the offense charged against him is proved beyond a reasonable doubt.").

[2] The court of appeals used this pseudonym and other conventions to protect the privacy of the witnesses and alleged victim. For consistency, we adopt the same conventions.

¶9    After dismissing the jury for the day, Judge Maynard disclosed to the parties that he recognized and was related by marriage to one of the witnesses in the courtroom. Specifically, he recognized Wife who had been sitting in the courtroom gallery. He explained that he believed Wife's mother and his own wife's grandmother are sisters. Judge Maynard stated that he had recognized Wife's face, but that he did not know her last name or that she was a witness in the case until she was excused from the courtroom after opening statements. Judge Maynard also expressed that he didn't view the relation as a "conflict that creates any concerns for [him]" but that he disclosed it to give counsel "an opportunity to discuss that or think about that."

¶10    That night, Mitton filed a motion to disqualify Judge Maynard based on the judge's disclosure.[3] Although he recognized that disqualification was not required by statute, Mitton argued that the connection between Judge Maynard and Wife "clearly raises issues concerning the public perception of impartiality [and] independence."

¶11    The next morning, before trial resumed, Judge Maynard informed the parties that the Honorable Brian G. Cannell, the presiding judge of the First District Court, had granted Mitton's motion to disqualify and had "vacated the trial."[4] Judge Maynard further advised that he had just visited the jurors and "excused them, t[elling] them . . . that they are no longer paneled in this

---

[3] A party in a criminal case may move to disqualify a judge for bias, prejudice, or a conflict of interest. UTAH R. CRIM. P. 29(b)(1)(A). When such a motion is filed, "[t]he judge against whom the motion . . . [is] directed shall, without further hearing, enter an order granting the motion or certifying the motion . . . to a reviewing judge." *Id.* R. 29(b)(2)(A). If the sitting judge certifies the motion to a reviewing judge, the sitting judge may not take "further action in the case until the motion is decided." *Id.* The district's presiding judge may serve as the reviewing judge for such motions. *Id.*

[4] Although he didn't use the exact terminology, by vacating the trial and excusing the jury, Judge Cannell effectively declared a mistrial. *State v. Mitton*, 2024 UT App 44, ¶ 8 n.4, 548 P.3d 908; *see also Mistrial*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A trial that the judge brings to an end without a determination on the merits because of a procedural error or serious misconduct occurring during the proceedings.").

case." Judge Maynard then explained that the case would be reassigned to the Honorable Spencer D. Walsh, and he worked with counsel to set a pretrial hearing before Judge Walsh on his next available hearing date in the Brigham City courthouse.

¶12   The following day, the State filed an amended information, enhancing one of the counts to a second-degree felony. It also moved for an expedited jury trial setting in front of Judge Walsh.

¶13   Several weeks later, Mitton moved to dismiss the charges against him, arguing, among other things, that the State's continued prosecution of him violates the federal and state constitutional protections against double jeopardy. Mitton argued that the discharge of the jury operates as an acquittal and that "the State is barred from retrying [him]" because he did not consent to the discharge and the discharge was not a "legal necessity."

¶14   At a hearing on his motion, Mitton posited what he characterized as alternatives to declaring a mistrial and discharging the jury. Specifically, he suggested that Judge Walsh, who "sits often in Brigham City[,] . . . could have been brought in with the same jury impaneled and been brought up to speed on the first day." Or alternatively, the jurors could have been sent home "while keeping them impaneled" until a new judge could be assigned.

¶15   Judge Walsh denied Mitton's motion to dismiss. He concluded that, although Mitton did not consent to a mistrial following Judge Maynard's disqualification, the mistrial was legally necessary. Citing Judge Cannell's findings, Judge Walsh found that Judge Cannell considered alternatives to discharging the jury and determined that no reasonable alternative existed because not discharging the jury "would not have even been a possibility from a logistical standpoint," as "calendaring constraints" made it impractical for a judge to become immediately available. Indeed, Judge Cannell reported that he had "reviewed [Judge Walsh's] availability and determined it would be several days, if not several weeks or months, before the retrial could proceed."[5] Judge Walsh also concluded that Judge Cannell created

---

[5] Judge Cannell twice supplemented his findings related to the necessity for discharging the jury and declaring a mistrial. Some of those findings were made months after the mistrial was declared and after Mitton's motion to dismiss was filed.

an adequate record disclosing the factual basis for his legal necessity determination.

*The Appeal*

¶16   Mitton sought interlocutory review of the denial of his motion to dismiss, which the court of appeals granted. On appeal, Mitton argued that Judge Walsh erred by "denying his motion to dismiss on double jeopardy grounds" because "Judge Cannell declared a mistrial without properly establishing legal necessity to do so." *State v. Mitton*, 2024 UT App 44, ¶¶ 16–17, 548 P.3d 908.

¶17   The court of appeals agreed with Mitton. Relying on *State v. Manatau*, 2014 UT 7, 322 P.3d 739, it determined that the "legal necessity" exception to double jeopardy cannot apply unless the parties are afforded an "adequate opportunity to object" to the mistrial before the jury is discharged. *Mitton*, 2024 UT App 44, ¶ 20 (cleaned up). The court then concluded that, because neither Mitton nor the State were given such an opportunity, Mitton cannot be retried without violating Utah's constitutional prohibition against double jeopardy.[6] *Id.* ¶ 21.

¶18   As part of its decision, the court of appeals also offered procedural guidance to trial courts facing a conflict issue like the one that arose in Mitton's trial. *Id.* ¶ 22. It outlined the steps the initial judge, reviewing judge, and assigned judge should take when confronted with a motion to disqualify mid-trial. *See id.* ¶¶ 22–29 & n.8.

¶19   We granted the State's petition for certiorari review.

## ISSUE AND STANDARD OF REVIEW

¶20   We granted certiorari to address whether the legal necessity exception to Utah's constitutional prohibition against

---

[6] In reaching its conclusion, the court of appeals deemed it unnecessary to address two other issues Mitton raised: (1) a challenge based on Utah's statutory bar against multiple prosecutions, UTAH CODE § 76-1-403; and (2) a challenge to the propriety of Judge Walsh's reliance on Judge Cannell's amended findings, *supra* ¶ 15 n.5. *See Mitton*, 2024 UT App 44, ¶ 16 n.6. Neither issue is before us on certiorari review. Further, because the court of appeals confined its analysis to the double jeopardy protections afforded by the Utah Constitution, we do not separately address any challenge Mitton raised under the Fifth Amendment.

6

double jeopardy can apply even where the parties were not afforded an opportunity to object before a mistrial was declared and the jury discharged. The court of appeals resolved this issue based on its interpretation of our caselaw. That interpretation presents a question of law, which we review for correctness. *State v. Labrum*, 2025 UT 12, ¶ 17, 568 P.3d 1075.

## ANALYSIS

I. THE LEGAL NECESSITY EXCEPTION TO DOUBLE JEOPARDY MAY STILL APPLY EVEN WHEN PARTIES AREN'T PROVIDED AN OPPORTUNITY TO OBJECT BEFORE A MISTRIAL IS DECLARED

¶21 Article I, section 12 of the Utah Constitution protects a criminal defendant from being "twice put in jeopardy for the same offense." This provision prohibits, among other things, the government "from making repeated attempts to convict an individual for the same offense after jeopardy has attached." *State v. Harris*, 2004 UT 103, ¶ 22, 104 P.3d 1250.

¶22 In a jury trial, jeopardy attaches when the jury is impaneled and sworn. *State v. Ambrose*, 598 P.2d 354, 358 (Utah 1979), *overruled on other grounds by Harris*, 2004 UT 103, ¶ 20. Thus, if a mistrial is declared and a jury is discharged before a verdict has been rendered, the State—with two exceptions—is barred from trying the defendant again for the same offense. *Harris*, 2004 UT 103, ¶ 24. Specifically, Utah's Double Jeopardy Clause bars the State from retrying a criminal defendant after jeopardy attaches unless: (1) the defendant consents to the jury's discharge, or (2) "legal necessity" requires the jury be discharged in the interest of justice. *Id.* (cleaned up). These exceptions allow courts to "balance the defendant's right to have his trial concluded by a particular tribunal with the public's interest in fair trials designed to end in just judgments." *State v. Cram*, 2002 UT 37, ¶ 8, 46 P.3d 230 (cleaned up).

¶23 The second of these two exceptions—the "legal necessity" exception—permits the retrial of a criminal defendant if declaring a mistrial and discharging the jury was the "only reasonable alternative to insure justice under the circumstances." *Ambrose*, 598 P.2d at 358; *see also Harris*, 2004 UT 103, ¶ 26. Although we have consistently resisted setting "specific rules for what constitutes legal necessity, . . . we have provided trial courts with an articulable guideline" to aid in their assessment of the issue. *Harris*, 2004 UT 103, ¶ 26 (cleaned up); *see also Ambrose*, 598 P.2d at 359.

¶24  First, we have said that "a trial court must carefully evaluate all of the circumstances" that may necessitate a mistrial, which "requires the trial judge to afford the parties adequate opportunity to object" and "to consider possible curative alternatives" to mistrial. *Harris*, 2004 UT 103, ¶ 27. Second, we require a trial court to "create a record disclosing the factual basis for the court's determinations that a mistrial is legally necessary and that no reasonable alternative exists." *State v. Manatau*, 2014 UT 7, ¶ 16, 322 P.3d 739; *see also Harris*, 2004 UT 103, ¶ 28.

¶25  The question presented in this appeal is what happens when the trial court fails "to afford the parties adequate opportunity to object." After observing that neither Mitton nor the State were afforded that opportunity, the court of appeals concluded that such a failure is dispositive of the legal necessity question, regardless of whether the record reveals that a mistrial was the only reasonable alternative to ensure justice under the circumstances. *See State v. Mitton*, 2024 UT App 44, ¶ 21, 548 P.3d 908. It stated that "for this reason alone, the State cannot retry Mitton without violating his constitutional protections against double jeopardy." *Id.*

¶26  The State contends that the court of appeals erred in interpreting our legal necessity jurisprudence. It describes that precedent as establishing "multi-component guidelines" that allow us to consider "the circumstances the trial court faced comprehensively, to ensure that the trial judge exercised sound discretion before deciding that a mistrial was the only reasonable choice." It argues that the court of appeals departed significantly from those guidelines, rendering "the opportunity to object a mandatory feature of legal necessity" and barring retrial even where a mistrial "would have been inevitable had an objection been raised."

¶27  We agree with the State that a trial court's failure to provide an opportunity to object before declaring a mistrial is not, standing alone, dispositive of the legal necessity question. Because we have often framed our procedural guidelines in mandatory terms, it is understandable that Mitton and the court of appeals read our legal necessity jurisprudence as supporting a different conclusion. But, as explained below, we have yet to articulate what consequences flow from a trial court's failure to afford the parties an opportunity to object before a mistrial is declared. And with the question now squarely before us, we conclude that even without

an opportunity to object, if the record reveals that there were no reasonable alternatives to mistrial under the circumstances, the legal necessity exception to double jeopardy still applies.

### A. The Legal Necessity Exception to Double Jeopardy Has Evolved to Include a Requirement that Parties Be Allowed to Object Before a Court Declares a Mistrial

¶28 We begin our analysis of the legal necessity exception by examining the four cases that largely form our jurisprudence on the subject.

¶29 First, *State v. Whitman*, 74 P.2d 696 (Utah 1937). There, the trial court judge "became somewhat incensed" at defense counsel's in-trial remarks and, after labeling counsel's conduct as "reprehensible," declared a mistrial over the defendant's objection and discharged the jury. *Id.* at 697. In reversing the court's subsequent rejection of the defendant's double jeopardy claim, we stated that "before the court may discharge a jury," (1) "there should exist . . . a legal necessity for such discharge," (2) "the court must make inquiry and find and determine that such necessity existed at the time of the discharge," and (3) "the essential facts as to such necessity, and the findings of the court thereon, must be made a matter of record." *Id.* at 698. We ultimately applied only the first step of the analysis, concluding that "there was no apparent reason for declaring a mistrial" and thus "the jury was unnecessarily discharged." *Id.* at 697–98. And based on that determination, we reversed the trial court's rejection of the defendant's double jeopardy claim. *Id.* at 698.

¶30 Second, *State v. Ambrose*, 598 P.2d 354 (Utah 1979), *overruled on other grounds by Harris*, 2004 UT 103, ¶ 20. The prosecutor in *Ambrose* recommended—in the presence of the deadlocked jury—that the jury should be urged to continue deliberating given "the costs involved, the expense, [and the] inconvenience to everybody." *Id.* at 356. After soliciting defense counsel's view of whether it was problematic for the prosecutor to comment on the cost of retrial, the trial court immediately declared a mistrial and discharged the jury without fielding any comments or objections. *Id.* at 356–58.

¶31 On appeal from the subsequent denial of a motion to dismiss, we analyzed whether the defendant could be retried without running afoul of Utah's Double Jeopardy Clause. *Id.* at 358. In discussing the legal necessity exception, we reaffirmed our intent not to "lay down specific rules in this area." *Id.* at 359. Still,

we described legal necessity as requiring "a determination that discharging the jury was the only reasonable alternative to insure justice under the circumstances." *Id.* And we emphasized that a trial court must be "careful" in making its determination given "the important rights . . . involved," and must exercise its discretion to declare a mistrial "scrupulous[ly]." *Id.* at 358, 360 (cleaned up).

¶32 In applying these "principles," we concluded that the record did not reveal that discharging the jury was the only reasonable alternative under the circumstances, and that, due to a lack of explanation from the trial court, we could not discern whether it "engaged in the scrupulous exercise of judicial discretion required." *Id.* at 359–60 (cleaned up). We then cautioned that a trial court "must . . . not only determine that legal necessity exists, but it must make its findings to that effect a matter of record, or a defendant may successfully claim former jeopardy on appeal." *Id.* at 360.

¶33 Finally, we discussed the State's separate assertion that because the defendant did not object to the trial court's discharge of the jury, the defendant implicitly consented to the mistrial and waived protection under the Double Jeopardy Clause. *Id.* We rejected that assertion, observing that "the court acted so abruptly" that defense counsel "had no opportunity to object." *Id.* Notably, however, we did not state that an opportunity to object was a dispositive element of the legal necessity determination. *See id.* at 360–61.

¶34 Third, *State v. Harris*, 2004 UT 103, 104 P.3d 1250. After the trial court discovered that the courtroom's equipment failed to record the first morning session of trial, the court asked the parties how they wanted to proceed. *Id.* ¶¶ 5–6. Defense counsel proposed that they either reexamine the first witness or continue without reexamination, agreeing that the defendant would waive his right to appeal. *Id.* ¶ 6. The State objected and argued that the trial could not continue. *Id.* The court declared a mistrial and another judge subsequently declined to dismiss the case based on double jeopardy. *Id.* ¶¶ 7–9.

¶35 On appeal, we analyzed whether the discharge of the jury was legally necessary.[7] *Id.* ¶¶ 22–39. We began by restating the

---

[7] Our review of the trial court's denial of defendant's motion to dismiss on double jeopardy grounds necessitated our review of the

(continued . . .)

"articulable guideline" we had provided to trial courts "for determining whether a particular set of facts is such that 'legal necessity' requires the court to discharge the jury in the interest of justice." *Id.* ¶ 26. Specifically, we stated that a trial court may discharge a jury if, "after careful inquiry," it determines that "discharging the jury is *the only reasonable alternative to insure justice under the circumstances*." *Id.* (cleaned up).

¶36 We then described the "'only reasonable alternative' standard" as having two elements that "must be satisfied." *Id.* ¶ 27. The first element requires a trial court to "carefully evaluate all of the circumstances and conclude that legal necessity mandates the discharge of the jury." *Id.* We explained that such an evaluation "requires" the court to consider possible alternatives to mistrial and to determine that none of the proposed alternatives are reasonable. *Id.* And although our discussion in *Ambrose* about objections was confined to the issue of waiver, *see* 598 P.2d at 360–61, in *Harris* we adopted another requirement: the opportunity to object, 2004 UT 103, ¶ 27 (citing *Ambrose*, 598 P.2d at 360–61). But we had no occasion to opine on how the absence of that opportunity would affect the ultimate analysis. After all, in *Harris*, both parties had an opportunity to object to the mistrial before it was declared.[8] *See* 2004 UT 106, ¶¶ 5–6.

¶37 We then moved to the second element of the "only reasonable alternative" standard, where we repeated the admonition from *Ambrose* that "the record must adequately disclose both the factual basis" for the mistrial and the reasons why the alternatives to mistrial were "unreasonable under the circumstances." *Id.* ¶¶ 27–28 (citing *Ambrose*, 598 P.2d at 360). We, at times, referred to this as a "requirement" on the trial court to "document its findings." *Id.* ¶ 29. At other times, we merely "encourage[d]" the court to "expressly articulat[e]" its thinking. *Id.* ¶ 28. But ultimately, we concluded that "a mistrial granted *without* express findings and determinations" would "*not* necessarily foreclose the retrial of a defendant." *Id.* (emphases added).

---

underlying declaration of the mistrial based on legal necessity. *State v. Harris*, 2004 UT 103, ¶¶ 1, 21–39, 104 P.3d 1250.

[8] We adopted the obligation to afford the parties an opportunity to object to the declaration of a mistrial without any analysis or explanation. *See id.* ¶ 27.

¶38   We explained that rather than offending double jeopardy protections, a trial court's lack of findings would impact the nature of appellate review. *Id.* ¶¶ 28–30. Specifically, we said that when a court, on the record, articulates the factual basis for the mistrial and explains why the alternatives are unreasonable, "we will not disturb that decision unless it is plainly wrong or is beyond the limits of reasonability." *Id.* ¶ 29 (cleaned up). But if a court fails to make such a record, we said that "the mistrial will operate as an acquittal unless the factual basis for the mistrial is readily apparent from the record." *Id.* ¶ 30. We cautioned that without an explanation of the grounds for legal necessity, "the trial judge cedes to us the authority and responsibility to second-guess his judgment by conducting an independent assessment of the reasonableness of the proposed alternatives." *Id.* ¶ 33.

¶39   We then completed our review by independently assessing the options available to the *Harris* trial court because it had not explained why the proposed alternatives to mistrial were unreasonable. *Id.* ¶¶ 33–38. We concluded that even if imperfect, the proposed alternatives were reasonable. *Id.* ¶¶ 34–36, 38–39. Thus, we held that because the trial court exceeded its discretion in declaring a mistrial, the reviewing court erred in subsequently concluding that the defendant could be retried without violating Utah's constitutional prohibition against double jeopardy. *Id.* ¶ 39.

¶40   Fourth, *State v. Manatau*, 2014 UT 7, 322 P.3d 739. The most recent of our cases discussing the legal necessity exception arose where the trial judge recused herself and declared a mistrial after a pocketknife was found in the suit jacket the defendant's wife had brought to the defendant to wear in court. *Id.* ¶¶ 3–5. Before the jury was dismissed, both parties objected to the mistrial, but the judge declined to change her mind and expressed her belief that double jeopardy would not attach. *Id.* ¶ 6. When the defendant later moved to dismiss the case on double jeopardy grounds, the newly assigned judge denied the motion on the grounds that the mistrial was legally necessary. *Id.* ¶ 7.

¶41   On appeal, we reviewed the mistrial decision to determine whether it was legally necessary.[9] *Id.* ¶ 8. Citing *Harris*,

---

[9] As we did in *Harris*, in assessing whether the trial court erred in not dismissing a retrial on double jeopardy grounds, "we review[ed] the rulings of two separate trial [judges]." *State v.*

(continued . . .)

we said we would review that determination for abuse of discretion, "afford[ing] substantial deference" to the trial court, if it articulated on the record the factual basis for its decision. *Id.* ¶¶ 8, 13. But in the absence of such findings, we said we would "independently assess whether the mistrial was legally necessary," *id.* ¶ 8, and that "the mistrial will operate as an acquittal if we are unable to find a readily apparent factual basis for the mistrial on the face of the record," *id.* ¶ 13. We added that a defendant "does not bear a burden to show a mistrial is legally necessary if the defendant objects to the mistrial." *Id.* ¶ 12. And we emphasized that "[a]bsent an adequate record, we resolve uncertainties as to the existence of legal necessity in favor of the defendant." *Id.* ¶ 13.

¶42   Applying these standards, we concluded that the trial court did not meet either of the two "only reasonable alternative" elements we had articulated in *Harris*. *Id.* ¶¶ 18–19; *see also supra* ¶¶ 36–37. We concluded that the trial court did not, in fact, consider alternatives to mistrial because the court was operating under the mistaken understanding that jeopardy had not yet attached when the mistrial was declared. *Manatau*, 2014 UT 7, ¶ 18. We then separately concluded that because the trial court did not consider alternatives to mistrial, it necessarily failed to make record findings about why alternatives were unreasonable. *Id.* ¶ 20.

¶43   Still, we recognized that we could independently assess "whether the trial court had any reasonable option to a mistrial." *Id.* ¶ 22. We took this opportunity, even though the trial court did not consider any alternatives on the record, and neither party offered any. *Id.* But we concluded that in making our independent assessment, we would "resolv[e] all uncertainties caused by gaps in the record in favor of the defendant." *Id.*

¶44  Finally, we conducted an independent assessment, reviewed the record, and concluded that "a reasonable alternative did exist"—or at least "it *may* have been reasonable for the case to have been reassigned to another judge." *Id.* ¶ 23 (emphasis added) (citing UTAH R. CRIM. P. 29(a) (describing the process for a judge reassignment mid-trial)). We acknowledged that "in some

---

*Manatau*, 2014 UT 7, ¶ 8, 322 P.3d 739. We reviewed the initial trial judge's order declaring a mistrial "to determine whether the mistrial was legally necessary." *Id.* And we reviewed the second trial judge's double jeopardy ruling denying the defendant's motion to dismiss. *Id.*

situations this alternative may be unreasonable—for example, where no other judge is available to continue the trial within a reasonable amount of time." *Id.* But, we stated that there was "no evidence of any circumstances that would make reassignment of the case to another judge unreasonable here." *Id.* And "[a]bsent findings that reassignment was not feasible, we must resolve any uncertainty caused by this gap in the record in favor of the defendant." *Id.*

### B. The Failure to Afford an Opportunity to Object Before Mistrial Does Not Foreclose the Legal Necessity Exception Under Utah's Double Jeopardy Clause

¶45   With our legal necessity precedent well in mind, we turn to the parties' arguments on appeal. The State contends that the court of appeals "disregarded this precedent and established a new test premised on rigid adherence to requirements." It argues that the factually varied circumstances that lead to mistrials demand "a holistic and discretionary analysis instead of a rigid, one-size-fits-all approach." It asserts that the court of appeals should have considered whether the trial court's decision to declare a mistrial "was ultimately an exercise of sound discretion" based on all the circumstances rather than concluding that the legal necessity exception did not apply solely because the parties were not given an opportunity to object. Mitton, on the other hand, argues that the court of appeals got it exactly right. He argues that Utah's legal necessity test "*requires* certain elements"—including the opportunity to object—"be[] satisfied." In other words, like the court of appeals, Mitton views the trial court's failure to afford that opportunity as "dispositive."[10]

¶46   To resolve this dispute, we return to the beginning. In *Whitman*, we simply said that a trial court may declare a mistrial and "discharge the jury under peculiar circumstances in cases of necessity." 74 P.2d at 698. Then, in *Ambrose*, we described the legal necessity exception as requiring "a determination that discharging the jury was the only reasonable alternative to insure justice under

---

[10] Mitton also argues that "the lack of an opportunity to object was the basis upon which the Court applied double jeopardy" in *Ambrose*. We disagree. Our reference to the lack of such an opportunity in *Ambrose* was made in the context of our discussion of a possible waiver of double jeopardy rights. It was not part of our legal necessity analysis. *See supra* ¶ 36.

the circumstances." 598 P.2d at 359. And we reaffirmed that standard in *Harris* and *Manatau*. *See Harris*, 2004 UT 103, ¶ 26; *Manatau*, 2014 UT 7, ¶ 10.

¶47 Thus, applying this precedent in situations where a criminal defendant has not consented to a mistrial, the fundamental question a trial court must ask itself is whether discharging the jury is the only reasonable alternative to ensure justice under the circumstances. If the answer is no, the court should remedy the circumstances that gave rise to the question by employing another alternative. But if the answer is yes, and a mistrial is declared without the defendant's consent, a reviewing court may need to resolve whether the trial court abused its discretion in concluding that declaring a mistrial was the only reasonable alternative available under the circumstances. *See infra* ¶ 52.

¶48 The other procedural steps we first articulated in *Whitman,* and repeated in *Ambrose,* remain. In considering whether to declare a mistrial, a trial court must (1) carefully evaluate all of the circumstances, (2) consider possible curative alternatives to a mistrial, and (3) if it decides to declare a mistrial, disclose on the record the factual basis for its determination that a mistrial is necessary and that no other reasonable alternative exists. *Whitman,* 74 P.2d at 698; *Ambrose,* 598 P.2d at 358–60. And, as part of step two—the requirement that a trial court consider other alternatives to a mistrial—a trial court must provide an opportunity for the parties to object and to propose alternatives. *Harris,* 2004 UT 103, ¶ 27; *Manatau,* 2014 UT 7, ¶ 11.

¶49 We have articulated these requirements in mandatory terms because of their importance. To avoid unnecessarily declaring a mistrial and subjecting a criminal defendant to successive trials, we expect trial courts to comply with these procedural requirements. But we have never established these procedural requirements as a constitutional test that absolutely determines whether the trial court has exercised sound discretion in declaring a mistrial. Instead, we have explained that the nature of our review of the legal necessity determination will vary depending on whether the court has complied with these requirements.

¶50 For example, in *Manatau,* even though the parties had an opportunity to object to the mistrial, neither side proposed an alternative, the trial court did not consider any possible alternatives, and it did not create a record of a legal necessity

determination. 2014 UT 7, ¶ 22. Still, we considered whether the mistrial was, in fact, legally necessary. *Id.* ¶¶ 22–24. We explained that *if* a trial court considers alternatives to mistrial and makes supporting findings on the record, "we afford substantial deference to its determination that legal necessity warrants a mistrial." *Id.* ¶ 13. But *if* a trial court fails to engage in the necessary analysis and articulate why no reasonable alternatives existed, we will independently assess whether there were reasonable alternatives to a mistrial, "resolving all uncertainties caused by gaps in the record in favor of the defendant." *Id.* ¶ 22.

¶51 Although we didn't discuss in *Harris* or *Manatau* whether these same rules would apply if the trial court failed to afford the parties an opportunity to object, we don't read either case as requiring anything different. After all, the parties in both cases were given an opportunity to object before the jury was discharged. *See Harris*, 2004 UT 103, ¶ 6; *Manatau*, 2014 UT 7, ¶ 6. Thus, we had no occasion to consider the consequence of a failure to afford such an opportunity. But we see no reason why we would treat this requirement any differently than the other procedural requirements guiding a legal necessity determination.

¶52 So, if a trial court affords the parties an opportunity to object and offer alternatives to mistrial, and the trial court explains why those alternatives were not reasonable under the circumstances, then a reviewing court will afford more deference to that "only reasonable alternative" determination. But if a trial court fails to afford an opportunity to object, then a reviewing court is tasked with independently determining whether the trial court had a reasonable alternative to a mistrial. And under those circumstances, the reviewing court will resolve any uncertainties caused by gaps in the record in favor of the defendant.

¶53 We endorse this approach as both consistent with our legal necessity jurisprudence and as striking the appropriate balance between the criminal defendant's right against double jeopardy with "the public's interest in fair trials designed to end in just judgments." *Cram*, 2002 UT 37, ¶ 8 (cleaned up). It incentivizes a trial court to follow these procedural requirements. But where

infeasible, this procedural misstep does not become a windfall for the accused.[11]

¶54　Applying these rules here, we conclude that the court of appeals erred by forgoing an independent determination of reasonable alternatives and, instead, treating Judge Cannell's failure to afford an opportunity to object prior to mistrial as dispositive of the legal necessity question. The court must conduct an independent assessment of the record to determine whether Judge Cannell had any reasonable alternatives to declaring a mistrial under the circumstances as they existed when Judge Maynard was disqualified mid-trial.[12] Because Judge Cannell did not afford the parties an opportunity to object, the court of appeals must resolve any uncertainty caused by gaps in the record in Mitton's favor.

### C. We Refer the Consideration for Additional Procedural Guidance to Our Judicial Council and Rules Committees

¶55　Finally, we pause to address the "clarification of the proper procedure" that the court of appeals offered in response to Judge Cannell's expressed uncertainty about what trial judges should do when faced with a motion to disqualify a judge during a criminal trial. *Mitton*, 2024 UT App 44, ¶ 22. We appreciate the court of appeals' responsiveness to Judge Cannell's request for

---

[11] The State's primary objection to the court of appeals' rigid application of the opportunity to object requirement was that there may be instances where a mistrial is required, and the court simply cannot afford the parties an opportunity to lodge an objection. For example, the State imagines catastrophic events like earthquakes or mass casualty events where trials are interrupted and there is no opportunity to invite counsel to offer objections before a jury is discharged from service. In such extreme circumstances, a trial court may fail to comply with the procedural requirements of our precedent. But even without an opportunity to object or an adequate record, a reviewing court will still retain the ability to examine those circumstances and conclude that retrial would not offend double jeopardy protections because no reasonable alternatives existed.

[12] Because the question of whether reasonable alternatives existed and whether Judge Cannell abused his discretion in declaring a mistrial is not before us on certiorari review, we do not undertake this assessment ourselves and express no opinion on it.

additional "clarity." But rather than embed new rules within caselaw, we have recently emphasized our preference to create procedural rules through our comprehensive rulemaking process, which accounts for consideration of public comment and "perspectives beyond those of the parties to a case at bar." *See State v. Labrum*, 2025 UT 12, ¶ 39, 568 P.3d 1075. That process also ensures that the rule is appropriately adopted by the body with constitutional authority to create such a rule. *See, e.g.*, UTAH CONST. art. VIII, § 4 ("The Supreme Court shall adopt rules of procedure and evidence to be used in the courts of the state . . . ."); *id.* § 12(1) ("There is created a Judicial Council which shall adopt rules for the administration of the courts of the state.").

¶56 Thus, to the extent the court of appeals purported to adopt new procedure in its effort to guide the courts, that guidance is not binding. But we do note that much of what the court of appeals described is already found in rule. *See Mitton*, 2024 UT App 44, ¶¶ 24–26 (citing UTAH R. CRIM. P. 29(b)). To the extent it's not, we refer this matter to our criminal rules advisory committee and the Judicial Council to consider, as appropriate, whether it would be prudent to adopt additional procedural or administrative rules to guide trial courts in these difficult and often time-sensitive situations.

¶57 We also ask our advisory rules committee to consider whether the procedural steps outlined in our legal necessity jurisprudence should be codified in rule. *See supra* Section I.A. Although we have, in the past, adopted procedural steps in our caselaw, our procedural and administrative rules should be codified in our rule books where they are more readily accessible to parties, lawyers, and the bench.

**CONCLUSION**

¶58 The State contends that the court of appeals erred in treating the trial court's failure to provide an opportunity to object as dispositive of legal necessity, a decision that resulted in double jeopardy barring retrial of Mitton. We agree. Specifically, we hold that the court of appeals erred by foreclosing application of the legal necessity exception solely because the trial court did not afford the parties an opportunity to object to the mistrial. Accordingly, we reverse the court of appeals' decision ordering dismissal of the charges against Mitton, and we remand to the court of appeals for further proceedings consistent with this opinion.